## TENNESSEE SMALL SCHOOL SYSTEMS, et al., Plaintiffs–Appellants,

v.

## Ned Ray McWHERTER, et al., Defendants–Appellees,

Charles O. Frazier, Director of Metropolitan Nashville, Davidson County Public Schools, et al., Defendants–Intervenors–Appellees.

Supreme Court of Tennessee, at Nashville.

March 22, 1993.

Lewis R. Donelson, H. Buckley Cole, Philip S. McSween, Nashville (Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, of counsel), for plaintiffs-appellants.

Charles W. Burson, Atty. Gen. & Reporter, John Knox Walkup, Sol. Gen., Jane W. Young, Asst. Atty. Gen., Rachel L. Steele, Asst. Atty. Gen., Nashville, for defendants-appellees.

Earnest G. Kelly, Jr., Memphis, for defendants-intervenors-appellees.

### OPINION

REID, Chief Justice.

This appeal is from the judgment of the Court of Appeals reversing the trial court and dismissing the plaintiffs' complaint that the statutory scheme for funding the kindergarten-through-12th grade public school system violates the education clause and equal protection provisions of the Tennessee Constitution.

█ The constitutional mandate that the General Assembly shall provide for a system of free public schools guarantees to all children of school age in the state the opportunity to obtain an education. The provisions of the constitution guaranteeing equal protection of the law to all citizens, require that the educational opportunities provided by the system of free public schools be substantially equal. The constitution, therefore, imposes upon the General Assembly the obligation to maintain and support a system of free public schools that affords substantially equal educational

opportunities to all students. The means whereby this obligation is accomplished, is a legislative prerogative. The system may include the imposition of funding and management responsibilities upon counties, municipalities, and school districts, within their respective constitutional powers. However, the constitution does not permit the indifference or inability of those state agencies to defeat the constitutional mandate of substantial equality of opportunity.

The record in this case supports the Chancellor's finding that there are constitutionally impermissible disparities in the educational opportunities afforded under the state's public school system. The record also supports the Chancellor's findings that "[t]he statutory funding scheme has produced a great disparity in the revenues available to the different school districts," and that there is a "direct correlation between dollars expended and the quality of education a student receives." However, the record also shows that many factors other than funding affect the quality of education provided and that the costs of operating schools may vary significantly. Consequently, all relevant factors may be considered by the General Assembly in the design, implementation, and maintenance of a public school system that meets constitutional standards.

The case will be remanded to the trial court for further proceedings consistent with this Opinion.

## I. STATEMENT OF THE CASE

The original complaint in this case was filed on July 7, 1988. The plaintiffs are the Tennessee Small School Systems, an unincorporated association of small school districts; superintendents and board of education members from several of those districts; students; and parents of students. The defendants are the Governor and other officials of the executive and legislative departments of the state in their official capacities. On appeal, no issue is made as to the parties or the plaintiffs' standing to sue.

The complaint, as amended, alleges that Article XI, Section 12 of the Tennessee Constitution, which requires that the General Assembly maintain and support a system of free public schools, establishes a fundamental right to an adequate free education and that the defendants are depriving the students, on whose behalf the suit was filed, of this fundamental right. The complaint further alleges that the funding system violates the equal protection provisions of Article XI, Section 8 and Article I, Section 8 of the Tennessee Constitution because the system results in inequalities in the provision of those educational opportunities guaranteed by Article XI, Section 12. The complaint seeks a declaratory judgment that the funding statutes are unconstitutional, that the defendants be enjoined from acting pursuant to those statutes, and that the state be required to formulate and establish a funding system that meets constitutional standards.

The defendants' response to the complaint, after a motion for summary judgment on the issues now presented was denied, is that Article XI, Section 12 "offers no enforceable qualitative standard" whereby the courts can "assess the quality of education and the sufficiency of the funding" provided by the legislative and executive departments. The defendants assert that the only right guaranteed by the education clause is "one of access to a free public school meeting the minimum standards applied statewide," and that the equal protection provisions "only assure the nondiscriminatory performance of the duty created by the education clause." The defendants' position is that education is the exclusive business of the legislative and executive branches.

Nine urban and suburban school systems, including those in Davidson, Shelby, Knox, and Hamilton Counties, were allowed to intervene as defendants. Their position is that the funding scheme enacted by the General Assembly is not subject to review by the courts, but if the issues presented are justiciable, the remedy for any constitutional violation should recognize "the differentials in costs and needs among the various school systems." Stated perhaps more simply, the larger, more

affluent systems do not want the funding scheme which favors their systems disturbed. They argue further that the smaller, less affluent systems should not be heard to complain because those systems have not made their best efforts to raise locally any additional funding needed. The intervenors characterize the evidence on which the Chancellor based his findings as "simplistic" and "anecdotal" and suggest that a "notion of substantial equality" is an "illusion." They express grave concern that the result will be "a redistribution of education funds away from the central cities and the growing suburbs."

The trial began on October 29, 1990, and lasted approximately six weeks. On July 25, 1991, the Chancery Court issued a Memorandum Opinion in which the court ruled in favor of the plaintiffs. On August 6, 1991, the trial court entered a declaratory judgment "in favor of the plaintiffs on the basis that the present public education funding system violates the equal protection requirements of the Tennessee Constitution." On September 13, 1991, the court entered a final judgment in which it found that the fashioning of an appropriate remedy was the prerogative of the General Assembly.

The defendants and intervenors appealed. The Court of Appeals reversed the judgment of the trial court and dismissed the case. Judge Todd, writing for the majority, ruled that the plaintiffs had failed to establish that the challenged funding system could not withstand scrutiny under any of the three standards of analysis—the rational basis test, intermediate scrutiny, or strict scrutiny—that are traditionally applied in equal protection cases. Judge Cantrell, concurring in a separate opinion, argued that the fundamental right granted by the constitution extends only to an education that meets the minimum standards set by the legislature or its designee. Judge Lewis dissented and, after an exhaustive review of the evidence, concluded that the facts found by the trial court are supported by the record and that the Chancery Court's judgment should have been affirmed on both the education clause and

equal protection provisions of the state constitution.

## II. FINDINGS OF FACT

■ The majority of the Court of Appeals did not address the sufficiency of the evidence or the standard of review. However, by reversing the judgment of the trial court, the majority necessarily, though not explicitly, concluded that the record in this case does not support the trial court's findings of fact. Where there has been no concurrence by the trial court and the Court of Appeals, this Court must conduct a *de novo* review of the record, "accompanied by a presumption of the correctness of the [trial court's] finding, unless the preponderance of the evidence is otherwise." Tenn.R.App.P. 13(d); T.C.A. § 27–1–113 (1980).

The record consists of more than 4,500 pages of transcript, 18 depositions, and 152 exhibits, and contains the testimony of several state officials, including the Chairman of the State Board of Education, the Executive Director of the State Board of Education, the Commissioner of Education, the Commissioner of Finance and Administration, several county superintendents of education, a performance audit drafted by the Comptroller of the Treasury, and the testimony of several expert witnesses.

After reviewing all of this material, the trial court summarized the organizational structure of the public school system, as follows:

The current statutory scheme concerning education is compiled in Volume 9 Title 49 of the Tennessee Code. There are currently 140 districts providing a Kindergarten through 12th grade for some 860,000 students. Responsibility for administering the system is divided between the state board of education, the commissioner of education, the local board of education, and the local superintendents. The state board has the responsibility of adopting policy statements and guidelines and has promulgated minimum rules and regulations entitled "Rules, Regulations and Minimum Standards for the Governance of Public

Schools in Tennessee." These rules comprise four volumes and deal with everything from minimum square feet for class rooms to the number of urinals in a school, curriculum formulation and teacher classification. Title 49 also details the mechanism for generating and distributing the funds which maintain and support the public education system.

The trial court then reviewed the statutory funding scheme, as follows:

### THE FUNDING SYSTEM

Public education in Tennessee is funded approximately 45% by the state, 45% by the local government, and 10% by the federal government.

The largest source of state funding is the Tennessee Foundation Program (TFP). The balance of state funding is in the form of categorical grants for textbooks, transportation, career ladder, and teacher fringe benefits. TFP funds are allocated based on an average daily attendance formula weighted for cost factors such as grade level, vocational courses, and similar factors, whereas categorical grants contain no provision for equalization among the various school districts. The TFP equalization formula accounts for differentials in assessed property values, but the amount available for equalization is less than $60,-000,000 out of an expenditure of $2.5 billion. Adjustments are also made for the training and experience of the teachers which results in more funds to school districts with better trained and more experienced teachers. This tends to benefit the wealthier school districts. As a result, the state funds provide little real equalization.

Local funding comes principally from property tax and local option sales tax. Some cities raise additional funds for public education through a wheel tax, beer tax, etc. The property tax is based on assessed property values and the tax rate specified for that purpose. T.C.A. § 67–5–801. Counties and municipalities are authorized to enact a local sales tax. T.C.A. § 67–6–702. One-half of the local option sales tax must be allocated to education in the county or municipality where the tax is collected. T.C.A. § 67–6–712. These funds are not tied to the number of pupils in the school district, the cost of providing education to the pupils, or any educational factor. However, in a county with more than one school district, the local option sales tax is divided on an average daily attendance of each school district. T.C.A. § 49–3–306. There is no provision for any equalization of local option sales tax funds between counties.

Finally, the Chancellor made the following findings of fact:

### FINDING OF FACTS

The statutory funding scheme has produced a great disparity in the revenues available to the different school districts. In 1986–87 fiscal year, the highest per capita county sales tax base was ten times that of the lowest. Because of lack of fiscal capacity, there is little the poor school districts can do to offset the differences. Per classroom spending varied in 1988–89 from $110,727 in Kingsport to $49,167 in Lewis County.

Total current funds available per pupil by county averaged $2,337 in the school year 1987 and varied from $1,823 to $3,669. Most of this variation results from the state's higher reliance on local government to fund education and the varying ability of the local government to raise sufficient funds. School districts with more sales and with higher property values and commercial development have more funds to educate their children. The wide disparity is related to differences in fiscal capacity and not necessarily from inadequate local effort. "Most school districts in the state—especially non-urban—cannot reasonably raise sufficient revenues from local sources to provide even the average amount of total funds for education per pupil statewide."

Under the current funding system, schools in plaintiffs' districts offer far less to students than schools in wealthier districts. Specifically, the evidence

shows that students in plaintiffs' schools are not afforded substantially equal access to adequate laboratory facilities, computers, current and new textbooks, adequate buildings, advance placement courses, varied curricula, advanced foreign language courses, music and art courses, drama and television courses. Plaintiffs' districts also fail in their efforts to retain teachers, fund needed administrators, and provide sufficient physical education and other programs.

The wealthier districts offer a wide variety of advanced placement courses; a broad curriculum with advanced science and math courses; adequate labs in both junior high and high schools; a choice of foreign languages; multiple computer courses; art, music, and drama courses; sufficient and current textbooks; and adequately supplied libraries. The schools are newer, cleaner, and safer. They provide an environment conducive to learning.

The evidence indicates a direct correlation between dollars expended and the quality of education a student receives. In the ten richest districts for the school year 1988–89, [66%] of the elementary schools and 77% of the secondary schools were accredited compared to 7% and 40% among the ten poorest districts. All of the schools in the Kingsport and Shelby County districts are accredited. In contrast, none of the Clay County, Wayne County, Hancock County and Crockett County schools are accredited. Some of the poorer school districts cannot even comply with the state's "minimum standards" because of inadequate funding.

Graduates from accredited high schools have better success in college acceptances. Students in plaintiffs' districts are more likely to attend unaccredited schools. Children in the poorer districts suffer from poor standardized test results, and have a higher need for remedial courses at college resulting in poorer chances for higher education.

The Board of Education and the Governor have proposed a New Basic Education Program Funding Plan. Under this plan the state would provide two-thirds of the funds to support and maintain a basic education program. One-third of the funds would be available for equalization based upon fiscal capacity including sales tax base as well as property tax base. This program will require greatly increased state funding.

(Footnotes and citations omitted.)

The record also shows that over the years, the distribution of sales tax and property tax revenues has become more concentrated as economic activity has moved from small local communities to larger regional retail centers. Purchases previously made by residents of rural school districts locally, are now made in the more urban counties, and the sales tax on those purchases is collected in the wealthier counties. With the construction of large retail centers in the urban counties, property tax revenues, though much less significant than sales tax revenues, also are concentrated in those same communities rather than distributed more evenly throughout the entire state. Because all revenues from the property tax and the local option sales tax are received by the county or city where collected, the result is the progressive exacerbation of the inequity inherent in a funding scheme based on place of collection rather than need.

Because such a small portion of state funding is allocated to equalization, disparities in economic resources among the school districts of the state have resulted in great disparities in the amount of funds available for education in the various districts. An audit of the Department of Education performed by the Comptroller of the Treasury in February of 1990 concluded:

Funds available for public education vary considerably from school district to school district in Tennessee. Most of this variation results from the state's high reliance on local governments to fund education and the varying ability of local governments to raise funds. The current formulas to distribute state funds attempt to equalize funds available for education, but they have had little effect because these formulas apply only

to a very small percentage of educational funding.

. . . .

The funds available for education and the source of funds vary substantially county by county in Tennessee. Total current funds available per pupil averaged $2,337 in school year 1987 and varied from $1,823 to $3,669.

Though not of critical importance for the purposes of this suit, the audit report also indicates that the disparity in available funding among the various counties and school districts does not, as contended by the defendants and intervenors, result from a lack of effort by the poorer districts. As noted by the Comptroller:

Comparing the actual revenues collected and the potential revenues available in each school district shows that about half the school districts have unused potential and half are above their potential. However, 15 of the 20 school districts with the lowest potential—those districts at the bottom of the list—had actual revenues for education greater than their potential. These counties tax at higher than the statewide average. Thirteen of the 20 school districts with the highest potential—those at the top of the list—have actual revenues for education below their potential. These counties taxed at below the statewide average.

This information shows that most school districts in the state—especially nonurban districts—cannot reasonably raise sufficient revenues from local sources to provide even the average amount of total funds spent for education per pupil statewide.

The regressive effect of the continuation of the existing scheme upon educational opportunities in those counties in which schools are inequitably funded was described in dramatic terms by the Wayne County Superintendent of Schools. He testified that the county's efforts to recruit industry to the area were severely hampered by the fact that the schools in the district were not accredited by the Southern Association of Colleges and Schools. Without additions to the tax base provided by new industry and related business, the county's property and sales tax revenues will continue to decline, further reducing funds available to support the school system. The vicious cycle thus continues.

The record establishes that the disparities in resources available to the various school districts result in significantly different educational opportunities for the students of the state.

The record also establishes that sufficient funds have not been available to some of the school districts to provide the programs and facilities necessary for an adequate educational system. Trial testimony indicates that many schools in the poorer school districts have decaying physical plants, and that some school buildings are not adequately heated and have non-functioning showers, buckling floors, and leaking roofs. School superintendents and students also testified that the poorer school districts do not provide adequate science laboratories for the students, even though state regulations require such facilities. In fact, evidence was adduced that some districts' laboratories are so inadequate that only teachers use the equipment in order to "demonstrate" lab techniques. At other schools, the teachers buy supplies with their own money in order to stock the labs. Still other schools engage in almost constant fundraising by students to provide needed materials.

Similarly, the textbooks and libraries of many of the poorer school districts are inadequate, outdated, and in disrepair. One compelling photograph in the record depicts a library in a Hancock County school. The library consists of only one bookcase nestled in a room containing empty boxes, surplus furniture, a desktop copier, kitchen supplies, a bottle of mouthwash, and a popcorn machine. When asked why newer textbooks and more functional libraries were not provided in the schools, the responsible official stated that the additional money needed for such improvements was not available. The lack of funds in some of the plaintiffs' districts also prevents schools in those areas from offering advanced placement courses,

state-mandated art and music classes, drama instruction, extracurricular athletic teams, or more than one foreign language in high school.

State officials directly responsible for the operation of the public school system have recognized the substantial inadequacy and the significant disparity in the funds available to the several school districts caused by the statutory funding scheme. The basic program for funding the public school system has been the Tennessee Foundation Program (TFP). The state comptroller's February 1990 performance audit found that, "The current formulas to distribute state funds do not effectively equalize the total funds available for education." The response of the Department of Education to this finding was:

The department concurs and states that the state is currently engaged in a study of revising the state's K through 12 funding formula and will present the results to the General Assembly. The study will focus on disparity in educational funding.

The response of the Board of Education to this finding was:

The board concurs and states that its Basic Education Program funding formula would result in a decrease in the disparity of funding available to local school systems. The board indicates that the Basic Education Program formula would gauge state appropriations to school systems according to their ability to raise local tax revenue for schools.

The Chairman of the Board of Education stated that the TFP "does not relate appropriations to actual costs of delivering programs and services." That official also recognized that under the TFP:

[T]here is no link between the changes in the costs of delivering programs and services at the local level and changes in appropriations.

. . . . .

. . . the amount of funding provided is too little to insure adequate funding of a basic educational program.

. . . . .

. . . [And, the TFP] does not assure the children in Tennessee equal access to quality educational resources.

Nonetheless, the TFP budget for the 1991–1992 school year was reduced approximately $113.5 million from the previous year. See 1992 Tenn.Pub.Acts, ch. 1018, sec. 11, Item 4.

In 1984, the State Board of Education, at the direction of the General Assembly, developed a Master Plan for Tennessee Schools. That plan has been reviewed and revised each year. The 1990 Master Plan, released in November 1990 during the course of the trial, addressed three major components, one of which was funding. The Introduction to the Plan includes the following statement:

Accomplishing this transformation [of education in Tennessee] will require adequate and sustained funding. Existing disjointed funding mechanisms must be abandoned in favor of a logical funding formula. The Basic Education Program (BEP) funding formula has been incorporated into this plan to provide adequate and equitable support to reform activities and future school programs. This formula ensures that essential school resources, such as teachers, materials, facilities, and transportation, will be available when and where they are needed.

. . . . .

The Master Plan for Tennessee Schools lists 17 goals to be accomplished in the next decade. The plan includes strategies for achieving the goals and sets forth how we will measure our progress in meeting the goals.

The Plan focuses on "three key result areas," one of which is "providing adequate and sustained school funding." In the funding section of the Plan, the "Current Situation" is described as follows:

Current funding mechanisms are not related to the costs of an adequate statewide educational program.

The Plan provides that the state's share of funding is to be two-thirds of the total. Using this ratio, the state's share of additional funds necessary to fund the BEP would be $287 million in fiscal year 1992,

$389 million in fiscal year 1993, $500 million in fiscal year 1994, $618 million in fiscal year 1995, and $664 million in fiscal year 1996.

The defendants, pressing their position that the public school system is adequate, have asked the Court to take judicial notice of the Educational Improvement Act of 1992 (1992 Tenn.Pub. Acts, ch. 535, codified in Title 49, Tennessee Code Annotated), which was enacted in furtherance of the Master Plan. The defendants emphasize that the Act contains a new formula which would replace the TFP and "more than a dozen categorical grants." The defendants state the following as "major innovations" under the new formula:

a) greater equalization of the local share distributed under the formula; b) fiscal capacity calculations based on sales tax base, property tax base, and income as opposed to just property tax base as under the TFP; and c) the BEP formula factors in differences in competitive salaries earned in different counties.

The defendants emphasize the provisions of the BEP, which included a proposed funding statute, from the perspective of November 1990. The plaintiffs, in response, press the Court to notice the September 1992 Master Plan Program Report prepared by the State Board of Education. While the Court can take judicial notice of the Educational Improvement Act of 1992 and compare its provisions with the proposed statute in the 1990 Master Plan, the 1992 Report itself is outside of the record, although it was included in the appendix to the plaintiffs' reply brief, apparently without objection by the defendants. At the time of the trial of this case, the BEP had been proposed but had not been enacted or funded. Funding, of course, is crucial; an educational plan heavily dependent upon additional funding provides little support for the defendants' contention that the public school system meets constitutional requirements.

The defendants' position in this case is that "there is no systematic relationship between expenditures and student performance," but if there is, the "disparities in expenditures were [not] caused by [plaintiffs'] lack of fiscal capacity." This position seems to be at odds with the 1990 Master Plan for Tennessee Schools, its stated goals and strategies, and the purpose of the Education Improvement Act of 1992. The commentaries and proposals, explicit and implicit in these documents emanating from the executive department, cast grave doubt upon the defendants' assertion that "[a]t the very least, the Tennessee system of education provides for the mastering of basic skills and minimum proficiencies by the students in every district of the state without regard to size or the wealth of the district."

The record supports the Chancellor's findings that the statutory funding scheme has produced great disparity in the funds available to the different school districts and that significant inadequacies and inequities in the system persist.

### III. JUSTICIABILITY

The intervenors contend that the issues presented in this case are inappropriate for adjudication by the courts. The same objections have been raised in other jurisdictions. *See McDaniel v. Thomas*, 248 Ga. 632, 285 S.E.2d 156 (1981); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989); *Board of Educ., Levittown Union Free School Dist. v. Nyquist*, 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982), *appeal dismissed*, 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983); *Board of Educ. of the City School Dist. of Cincinnati v. Walter*, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Edgewood Indep. School Dist. v. Kirby*, 777 S.W.2d 391 (Tex.1989); *Seattle School Dist. No. 1 of King County v. State*, 90 Wash.2d 476, 585 P.2d 71 (1978); *Washakie County School Dist. No. 1 v. Herschler*, 606 P.2d 310 (Wyo.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980). In all of these cases, the respective courts held that the constitutionality of the state's education funding system presented a justiciable issue. As the Court of Appeals of New York stated in *Nyquist:*

148

With full recognition and respect ... for the distribution of powers in educational matters among the legislative, executive and judicial branches, it is nevertheless the responsibility of the courts to adjudicate contentions that actions taken by the Legislature and the executive fail to conform to the mandates of the Constitutions which constrain the activities of all three branches. That because of limited capabilities and competences the courts might encounter great difficulty in fashioning and then enforcing particularized remedies appropriate to repair unconstitutional action on the part of the Legislature or the executive is neither to be ignored on the one hand nor on the other to dictate judicial abstention in every case.

*Nyquist,* 57 N.Y.2d at 39, 453 N.Y.S.2d at 648, 439 N.E.2d at 363.

■ Likewise, under settled Tennessee law, the issues raised in this case are justiciable. As stated in *Biggs v. Beeler,* 180 Tenn. 198, 219, 173 S.W.2d 946, 948 (1943):

[B]eginning with the leading case of *Marbury v. Madison,* 1 Cranch. 137, 154, 2 L.Ed. 60, in which Chief Justice Marshall sailed an uncharted sea, and, citing no authority, relied alone on principle and reason, our Courts have not hesitated to strike down legislative action which disregarded, transgressed and defeated, either directly or indirectly, mandates of the organic and fundamental law laid down in the Constitution.

Similarly, in this case, it is our duty to consider the question of whether the legislature, in establishing the educational funding system, has "disregarded, transgressed and defeated, either directly or indirectly," the provisions of the Tennessee Constitution. As the Kentucky Supreme Court observed recently in response to the same argument, "[t]o avoid deciding the case because of 'legislative discretion,' 'legislative function,' etc., would be a denigration of our own constitutional duty." *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d at 209.

## IV. EDUCATION CLAUSE CHALLENGE

The plaintiffs assert that the statutory scheme of funding the K–through–12 system of public education violates the provisions of Article XI, Section 12 of the Tennessee Constitution. Article XI, Section 12 provides as follows:

The State of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools. The General Assembly may establish and support such postsecondary educational institutions, including public institutions of higher learning, as it determines.

The defendants deny that Article XI, Section 12 guarantees "an education which is exactly or substantially the same education received by children in other counties." They maintain that the education clause contains "no enforceable qualitative standard for assessing the quality of education." The defendants insist that the only effect of Article XI, Section 12 "is for the legislature to authorize a system whereby K–12 education may be delivered" and that "despite disparities in expenditures and educational opportunities," the present system "satisfies the constitutional mandate."

This issue has been extensively litigated in other jurisdictions during the last several years, but the decisions of the courts in those jurisdictions provide little guidance in construing the reach of the education clause of the Tennessee Constitution. This is true because the decisions by the courts of other states are necessarily controlled in large measure by the particular wording of the constitutional provisions of those state charters regarding education and, to a lesser extent, organization and funding. Based upon the language of their respective state constitutions, some courts have rejected education clause challenges to public school funding legislation. *See, e.g., Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005, 1025 (Colo.1982) (*en banc*) (Colorado Constitution's requirement of a "thorough and uniform system of free pub-

lic schools," while mandating equal educational opportunities, does not, as contended by the plaintiffs, necessitate equal educational expenditures per pupil); *McDaniel v. Thomas*, 285 S.E.2d at 164 (constitution requires only an "adequate education," not equal educational opportunities); *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635, 647 (1975) (equal educational opportunities not required by constitutional requirement of "general, uniform and thorough system" of public schools); *Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 458 A.2d 758, 776 (1983) ("thorough and efficient" clause commands only that legislature provide the students of the state "with a basic public school education"); *East Jackson Pub. Schools v. State*, 133 Mich.App. 132, 348 N.W.2d 303, 305 (1984) (provision mandating legislature to "maintain and support a system of free public elementary and secondary schools" grants only a right to an adequate education); *Board of Educ., Levittown Union Free School Dist. v. Nyquist*, 57 N.Y.2d at 47–48, 453 N.Y.S.2d at 653, 439 N.E.2d at 368–69 (constitutional provision for "the maintenance and support of a system of free schools" contemplates only "minimal acceptable facilities and services"); *Britt v. North Carolina State Bd. of Educ.*, 86 N.C.App. 282, 357 S.E.2d 432, 436 (1987) (state constitutional provision requiring "general and uniform system of free public schools ... wherein equal opportunities shall be provided for all students" mandates only equal access to schools, not a right to identical opportunities); *Board of Educ. of the City School Dist. of Cincinnati v. Walter*, 390 N.E.2d at 825 (constitutional requirement that a "thorough and efficient" education be provided mandates only that students not be deprived of "educational opportunity"); *Fair School Fin. Council of Oklahoma, Inc. v. State*, 746 P.2d 1135, 1149 (Okla.1987) (mandate to "establish and maintain" a public school system guarantees only a "basic, adequate education according to [state] standards ..."); *Olsen v. State ex rel. Johnson*, 276 Or. 9, 554 P.2d 139, 148 (1976) (constitution prescribing a "uniform and general system" of schools guarantees only a minimum of educational opportunity); *Danson v. Casey*, 484 Pa. 415, 399 A.2d 360, 365 (1979) (a "thorough and efficient" education is equated with an "adequate," "minimum," or "basic" education); *Richland County v. Campbell*, 294 S.C. 346, 364 S.E.2d 470, 472 (1988) (constitutional requirement that legislature maintain and support public schools guarantees equal standards and equal opportunity under the method of funding chosen by the legislature).

However, the courts in other states have upheld constitutional challenges based upon their respective education clauses. *See, e.g., Rose v. Council for Better Educ.*, 790 S.W.2d at 211 (the constitutionally required "efficient" system of public schools "must be substantially uniform throughout the state," providing every child in the state "with an equal opportunity to have an adequate education"); *Helena Elementary School Dist. No. 1 v. State*, 236 Mont. 44, 769 P.2d 684, 690 (1989) (constitution expressly provides for "equality of educational opportunity"), *modified in*, 236 Mont. 44, 784 P.2d 412 (1990) (delaying effective date of decision); *Abbott v. Burke*, 119 N.J. 287, 575 A.2d 359, 368–69 (1990) ("thorough and efficient" system will provide an "equal educational opportunity for children" enabling each student to become "a citizen and ... a competitor in the labor market"); *Edgewood Indep. School Dist. v. Kirby*, 777 S.W.2d 391, 397 (Tex.1989) ("efficient" system guarantees "substantially equal access to similar revenues per pupil at similar levels of tax effort" so that students are "afforded a substantially equal opportunity to have access to educational funds"); *Seattle School Dist. No. 1 of King County v. State*, 585 P.2d at 97 (constitutional language calling for "ample provision" for a "general and uniform" system of schools imposes a duty to "make ample provision for the 'basic education' of our resident children through a general and uniform system supported by dependable and regular tax sources"); *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859, 877 (1979) ("thorough and efficient" education is one which "develops, as best the state of education expertise allows, the minds, bod-

ies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically").

An education clause was first added to the Tennessee Constitution in 1835. Article XI, Section 10 of the 1835 Constitution provided as follows:

> Knowledge, learning, and virtue, being essential to the preservation of republican institutions, and the diffusion of the opportunities and advantages of education throughout the different portions of the State, being highly conducive to the promotion of this end; it shall be the duty of the General Assembly in all future periods of this Government, to cherish literature and science. And the fund called the common school fund, and all the lands and proceeds thereof, dividends, stocks, and *other property of every description whatever*, heretofore by law appropriated by the General Assembly of this State for the use of common schools, and all such as shall hereafter be appropriated, shall remain a perpetual fund, the principal of which shall never be diminished by legislative appropriation, and the interest thereof shall be inviolably appropriated to the support and encouragement of common schools throughout the State, and *for the equal benefit of all the people thereof;* and no law shall be made authorizing said fund, or any part thereof, to be diverted to any other use than the support and encouragement of common schools....

(Emphasis added.)

The declaration that "[k]nowledge, learning, and virtue, [are] essential to the preservation of republican institutions," contained in the same provision of the constitution that created a public school system and provided for its support through a common school fund, established the legal right to public education in Tennessee. This basic policy was reaffirmed by retention of the same language in Article XI, Section 12 of the Constitution of 1870. However, the requirement "to cherish literature and science" imposed upon the General Assembly in the Constitutions of 1835 and 1870 was

replaced by the substantive and definitive command that the "General Assembly shall provide for the maintenance [and] support ... of a system of free public schools," found in the 1978 amendment to Article XI, Section 12.

The defendants contend that the 1978 amendment to the Education Clause "provides no standard against which the quality of education ... may be judged" and, therefore, there is no standard whereby the courts can measure the adequacy of funding or the educational program itself. The defendants recite a long history of statutory and administrative inequities in the funding of the system prior to 1978 and argue that "a system meeting those principles [of uniformity and equality] did not then exist and had never existed." The defendants also note as significant the absence in the 1978 amendment of such words as "uniform" or "efficient," relied upon by other courts to grant relief.

■ The defendants' argument overlooks the plain meaning of Article XI, Section 12. That provision expressly recognizes the *inherent value* of education and then requires the General Assembly to "provide for the maintenance, support and eligibility standards of a system of free public schools." The constitution speaks directly to a right of inherent value, education. As used in Article XI, Section 12, the word "education" has a definite meaning and needs no modifiers in order to describe the precise duty imposed upon the legislature. The first definition of "education" in the unabridged edition of *The Random House Dictionary of the English Language*, 454 (2d ed. 1987) is: "The act or process of imparting or acquiring general knowledge, developing the powers of reasoning and judgment, and generally of preparing oneself or others intellectually for mature life." Indeed, modifiers would detract from the eloquence and certainty of the constitutional mandate—that the General Assembly shall maintain and support a system of free public schools that provides, at least, the opportunity to acquire general knowledge, develop the powers of reasoning and judgment, and generally prepare

students intellectually for a mature life. Contrary to the defendants' assertion, this is an enforceable standard for assessing the educational opportunities provided in the several districts throughout the state.

The defendants would use the flexibility of means granted by the constitution to avoid the certainty of responsibility. The record of the 1977 convention shows clearly that the delegates recognized that the responsibility for designing and maintaining a free public school system rested on the General Assembly and that the General Assembly needed flexibility in meeting that responsibility. One delegate, Walter Helms of Humboldt, reported to the convention:

> We wanted a standard sort of article in the Constitution that would leave the legislature free to act as conditions and circumstances change, to provide the necessary types of programs across the State that the people need and to fund it in a way that was feasible at that particular time. All of us have seen periods of maybe abundance and periods of scarcity. We cannot predict those. *The legislature needs a free hand in the funding of its programs.*

*The Journal of the Debates of the Constitutional Convention of the State of Tennessee (1977)*, 395 (Sept. 28, 1977) (emphasis added). Delegate Helms's report recognized the legislature's responsibility to provide the necessary educational programs "across the state" and the need for a flexible funding scheme that would accommodate times of abundance and scarcity. According to that report, the "free hand" given to the legislature relates to "funding," not the programs "the people need."

The value of education to each person and to society in general is immeasurably great. Several state supreme courts in school finance cases have recognized that education is a fundamental right. The West Virginia Supreme Court in *Pauley v. Kelly*, 255 S.E.2d at 878, held that because that state's constitution contained an education clause, education is a fundamental right in that state. In *Washakie County School Dist. No. 1 v. Herschler*, 606 P.2d at 332, the Wyoming Supreme Court found that "in the light of the emphasis which the Wyoming constitution places on education, there is no room for any conclusion but that education for the children of Wyoming is a matter of fundamental interest." In *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359, 373 (1977), the Connecticut Supreme Court stated that "in the light of the Connecticut constitutional recognition of the right to education ... it is, in Connecticut, a fundamental right."

The United States Supreme Court addressed the value of education in *Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), as follows:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

The significant value of education and the responsibility of the state with regard to education was recognized by this Court in *Leeper v. State*, 103 Tenn. 500, 515, 53 S.W. 962, 965 (1899), with this declaration:

> [T]he kind and quality of instruction given to the young is as important as the food furnished the people, and the public school is, in the highest sense, a public institution....

The certain conclusion is that Article XI, Section 12 of the Tennessee Constitution guarantees to the school children of this state the right to a free public education.

Because, as discussed below, the plaintiffs are entitled to relief under the equal protection provisions of the state constitution, the precise level of education mandated by Article XI, Section 12, and the extent, if any, to which the system does not comport with the education clause need not be determined at this time.

## V. *EQUAL PROTECTION CHALLENGE*

The plaintiffs did not appeal from the trial court's decision that, based on the United States Supreme Court decision in *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), they are not entitled to relief under the equal protection provisions of the Fourteenth Amendment to the United States Constitution. The Court found in *Rodriguez* that, for the purpose of equal protection analysis, education is not a fundamental right under the federal constitution because it is neither explicitly nor implicitly protected by that constitution. After rejecting strict scrutiny analysis, which would have been appropriate had the court found education to be a fundamental right, the Court held that the factor of local control provided a "rational basis" for the admittedly "imperfect" Texas financing system.

The plaintiffs contend, however, that they are entitled to relief under the equal protection provisions of the Tennessee Constitution. The equal protection provisions of the Tennessee Constitution and the Fourteenth Amendment are historically and linguistically distinct. They differ in their perspective because of their respective positions in the nation's scheme of federalism. *See* Note, *State Constitutional Analysis of Public School Finance Reform Cases: Myth or Methodology*, 45 Vand.L.Rev. 129 (1992); Note, *To Render Them Safe: The Analysis of State Constitutional Provisions in Public School Finance Reform Litigation*, 75 Va.L.Rev. 1639 (1989). As stated in *Doe v. Norris*, 751 S.W.2d 834, 838 (Tenn.1988), "In the interpretation of the Tennessee Constitu-

tion, this Court is always free to expand the minimum level of protection mandated by the federal constitution." Nonetheless, the Court has stated in previous decisions that Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution and the Fourteenth Amendment to the Constitution of the United States confer essentially the same protection upon the individuals subject to those provisions. *Marion County Tenn. River Transp. Co. v. Stokes*, 173 Tenn. 347, 350, 117 S.W.2d 740, 741 (1938); *Motlow v. State*, 125 Tenn. 547, 560, 145 S.W. 177, 180 (1912).

Pursuant to Article I, Section 8:

**No man to be disturbed but by law.—** That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property but by the judgment of his peers or the law of the land.

Article XI, Section 8 provides:

**General laws only to be passed.—**The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie, [immunities] or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

These two provisions of the Tennessee Constitution apply to different circumstances but, together, guarantee equal privileges and immunities for all those similarly situated. As stated in *The Stratton Claimants v. The Morris Claimants*,[1] 89 Tenn. 497, 522, 15 S.W. 87, 92 (1891):

Citizens may be classified under Article I, Section 8, of the Constitution when the object of the Legislature is to subject them to the burden of certain disabilities, duties, or obligations not imposed upon

---

1. In the Tennessee Reports, this case is referred to as stated above. In the South Western Re-

porter cited above, however, this case is referred to as *Dibrell v. Morris' Heirs*.

the community at large. And citizens may be classified under Article XI, Section 8, of the Constitution when the object of the Legislature is to confer upon them certain rights, privileges, immunities, or exemptions not enjoyed by the community at large.

If the classification is made under Article I, Section 8, every one who is in, or may come into, the situation and circumstances which constitute the reasons for and the basis of the classification, must be subjected to the disabilities, duties, obligations, and burdens imposed by the statute, or it will be partial and void. And if the classification is made under Article XI, Section 8, every one who is in, or may come into, the situation and circumstances which constitute the reasons for and basis of the classification, must be entitled to the rights, privileges, immunities, and exemptions conferred by the statute, or it will be partial and void.

Thus these provisions of the Tennessee Constitution assure the nondiscriminatory performance of the duty created by Article XI, Section 12.

This Court has followed the framework developed by the United States Supreme Court for analyzing equal protection claims. *Doe v. Norris,* 751 S.W.2d at 840–42. It has utilized three standards of scrutiny, depending upon the right asserted. *See City of Memphis v. International Brotherhood of Elec. Workers Union,* 545 S.W.2d 98, 101 (Tenn.1976), (reduced scrutiny); *Mitchell v. Mitchell,* 594 S.W.2d 699, 701 (Tenn.1980) (heightened scrutiny); *Doe v. Norris,* 751 S.W.2d at 840 (strict scrutiny). In the case before the Court, the Chancellor found the public school system to be constitutionally invalid under all three levels of scrutiny.

However, if the system fails to meet the "rational basis" test, which imposes upon those challenging the constitutionality of the system the greatest burden of proof, the plaintiffs will be found to prevail and further analysis will not be necessary. The "rational basis" analysis was discussed in *Doe v. Norris* as follows:

The concept of equal protection espoused by the federal and our state constitutions guarantees that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920); *see Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *State ex rel. Department of Social Services v. Wright,* 736 S.W.2d 84 (Tenn.1987). Conversely, things which are different in fact or opinion are not required by either constitution to be treated the same. *Plyler v. Doe, supra* 457 U.S. at 216, 102 S.Ct. at 2394. "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States," and legislatures are given considerable latitude in determining what groups are different and what groups are the same. *Id.* In most instances the judicial inquiry into the legislative choice is limited to whether the classifications have a reasonable relationship to a legitimate state interest. *Id.; see State v. Southern Fitness and Health, Inc.,* 743 S.W.2d 160, 164 (Tenn.1987); *Harrison v. Schrader,* 569 S.W.2d 822, 825 (Tenn. 1978).

In *Harrison v. Schrader,* 569 S.W.2d 822, 825–826 (Tenn.1978), the Court also found that the determinative issue is whether the facts show some reasonable basis for the disparate state action. The Court stated as follows:

Under this standard, if some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it, the classification will be upheld.

\* \* \* \* \* \*

The test to be applied has been set forth in numerous cases. The classification must rest upon a reasonable basis. If it has a reasonable basis, it is not unconstitutional merely because it results in some inequality. Reasonableness depends upon the facts of the case and no general rule can be formulated for its determination.

The burden of showing that a classification is unreasonable and arbitrary is placed upon the individual challenging the statute; and if any state of facts can reasonably be conceived to justify the classification or if the reasonableness of the class is fairly debatable, the statute must be upheld.

(Citations omitted.)

■ The defendants hardly can deny that the record demonstrates substantial disparities in the educational opportunities afforded students in the several school districts. Indeed, they acknowledge that "there are undoubtedly disparities in expenditures and educational opportunities in Tennessee." They assert, though with little success, that the legislature "may act incrementally" in addressing educational reform and that there is "a body of thought and evidence disputing the existence of a direct relationship between expenditures and performance." However, they rest their case, in large measure, upon the contention that the benefits of local control of public schools justify the inequities in educational opportunities provided.

A number of courts from other jurisdictions have upheld state education financing systems challenged on equal protection grounds after subjecting those funding systems to the "rational basis" test. Those decisions, like *Rodriguez,* have most often offered as the reason for tolerating differences in spending from school district to school district, the need to promote and protect the policy of "local control" over the operation of public schools. *See, e.g., Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005; *Board of Educ., Levittown Union Free School Dist. v. Nyquist,* 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359. *See also McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156; *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635; *Hornbeck v. Somerset County Bd. of Educ.,* 295 Md. 597, 458 A.2d 758; *East Jackson Pub. Schools v. State,* 133 Mich.App. 132, 348 N.W.2d 303; *Board of Educ. of the City School Dist. of Cincinnati v. Walter,* 58 Ohio St.2d 368, 390 N.E.2d 813; *Fair School Fin. Council of Oklahoma, Inc. v.*

*State,* 746 P.2d 1135; *Olsen v. State,* 276 Or. 9, 554 P.2d 139; *Kukor v. Grover,* 148 Wis.2d 469, 436 N.W.2d 568 (1989). In most of these cases, the opinions contain only conclusory statements concerning the importance of local control.

For example, in *Lujan* the court held that the legitimate state purpose of the funding system legislation was "local control": "That is, control of the locally elected school board by the voters in the district. Such control is exercised by influencing the determination of how much money should be raised for the local schools, and how that money should be spent." *Lujan,* 649 P.2d at 1022–23. In *Nyquist,* the court said that "the justification offered by the State—the preservation and promotion of local control of education—is both a legitimate State interest and one to which the present financing system is reasonably related." *Nyquist,* 57 N.Y.2d at 44, 453 N.Y.S.2d at 651, 439 N.E.2d at 366. In *Kukor,* the Wisconsin Supreme Court also applied the "rational basis" test and stated that "[t]he principle of local control in Wisconsin ... is not merely a theoretical notion, but rather is a constitutionally based and protected precept as to which the framers of our constitution were firmly committed." *Kukor,* 436 N.W.2d at 580–581. The finding that the need for local control of the public school system was a rational basis for the state's funding system thus led the court to rule that the Wisconsin system was constitutional.

We conclude that the better reasoned opinions are those which have rejected the argument that local control is justification for disparity in opportunity. In *Dupree v. Alma School Dist. No. 30,* 279 Ark. 340, 651 S.W.2d 90 (1983), the Supreme Court of Arkansas identified the weaknesses inherent in relying upon the concept of "local control" to justify spending disparities. Applying the "rational basis" test, the court held in *Dupree* that the Arkansas system was unconstitutional. In its opinion, the court rejected the concept of "local control" as a rational basis for the state's public school funding system:

The trial court found the educational opportunity of the children in this state

should not be controlled by the fortuitous circumstance of residence, and we concur in that view. Such a system only promotes greater opportunities for the advantaged while diminishing the opportunities for the disadvantaged.

Those jurisdictions finding no equal protection violation in a system based on district wealth generally uphold the system of funding by finding a legitimate state purpose in maintaining local control. We find however, two fallacies in this reasoning. First, to alter the state financing system to provide greater equalization among districts does not in any way dictate that local control must be reduced. Second, as pointed out in *Serrano* [*v. Priest*, 18 Cal.3d 728, 761, 135 Cal.Rptr. 345, 364, 557 P.2d 929, 948 (1976) ], "The notion of local control was a 'cruel illusion' for the poor districts due to limitations placed upon them by the system itself.... [So long as the assessed valuation within a district's boundaries is a major determinant of how much it can spend for its schools, only a district with a large tax base will truly be able to decide how much it really cares about education. The poor district cannot freely choose to tax itself into an excellence which its tax rolls cannot provide.] Far from being necessary to promote local fiscal choice, the present system actually deprives the less wealthy districts of the option." Consequently, **even without deciding whether the right to a public education is fundamental,** we can find no constitutional basis for the present system, as it has no rational bearing on the educational needs of the districts.

*Dupree*, 651 S.W.2d at 93. [Emphasis added.] *See also Serrano v. Priest (Serrano I)*, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971); *Serrano v. Priest (Serrano II)*, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976), *cert. denied sub nom. Clowes v. Serrano*, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977).

There is no doubt that county and school district officials collectively control, in the management sense, the educational resources within a school district. However, in some counties, this is a very different matter from effective control of the quality of education provided by the local system. Property and local option sales tax revenues, which constitute a substantial part of the total funds available to a district, are limited by the economic conditions of the county in which the district is located. If a county has a relatively low total assessed value of property and very little business activity, that county has, in effect, a stone wall beyond which it cannot go in attempting to fund its educational system regardless of its needs. In those cases, local control is truly a "cruel illusion" for those officials and citizens who are concerned about the education of the county's school children. In those circumstances, actual control is in the hands of those who have the constitutional power and duty to remove the obstacles to education, whether those obstacles be inability to raise additional funds locally or indifference to the quality of education.

There is an even more serious flaw in the defendants' argument that local control justifies disparities in opportunity. There has been no showing that a discriminatory funding scheme is necessary to local control. In their discussion of this issue, the defendants comment upon the "beneficial, indeed essential, role played by local responsibility for and community involvement in local education." This cannot reasonably be disputed. However, it does not follow that the community must be limited by its own resources in providing that education. The defendants' premise seems to be that if the state asserts its constitutional duty to maintain and support a public school system, the state must exercise complete control over the system. Defendants even quote a line from a federal court decision making the same point: "The one who pays the educational piper generally gets to call the educational tune...." *Kelley v. Board of Educ.*, 836 F.2d 986, 999 (6th Cir.1987), *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988).

The appropriate response to this is found in the defendants' own argument, which is as follows: the taxing power of counties

and municipalities is found at Article II, Section 29 of the Tennessee Constitution; that provision authorizes the legislature to give counties and municipalities the power to impose taxes in accordance with state law, a power which includes taxes for the support of education; and Article II, Section 24, the State Spending Clause, gives the General Assembly the widest discretion in assigning the relative shares of responsibility of the state and local governments for funding state mandated services. The defendants' reasoning continues: these provisions establish the constitutional relationship between the state and local government; while counties are provided for in the constitution, the constitution does not expressly set out the subject matter about which counties may legislate; for the most part, the powers of counties are left to the discretion of the legislature (*Edmonson v. Walker*, 137 Tenn. 569, 583, 195 S.W. 168, 171 (1917)); local governments have no power to tax absent legislative delegation of that power; the state may also require a county to appropriate funds for a state purpose or for a purpose common to both state and county (*State ex rel. Ledbetter v. Duncan*, 702 S.W.2d 163, 165 (Tenn.1985)); and indeed, it is clear that the constitution gives the legislature the greatest flexibility in determining the allocation of responsibilities between state and local government.

In describing the constitutional relationship between the state and local government and their respective powers, the defendants have stated well the reason local control is no justification for a system that discriminates on the happenstance of residence. But, as we have previously noted, the legislative flexibility mentioned in the defendants' rationale does not extend to using the inability or indifference of local government to excuse a duty specifically imposed upon the General Assembly by the constitution.

The proof before us fails to show a legitimate state interest justifying the granting to some citizens, educational opportunities that are denied to other citizens similarly situated, and, thus, fails to satisfy even the "rational basis" test applied in equal protection cases.

The record supports the Chancellor's finding that the disparities in educational opportunities available to public school students throughout the state, found to be constitutionally impermissible, have been caused principally by the statutory funding scheme, which, therefore, violates the constitutional guarantee of equal protection.

The essential issues in this case are quality and equality of education. The issue is not, as insisted by the defendants and intervenors, equality of funding. Some factors that bear upon the quality and availability of educational opportunity may not be subject to precise quantification in dollars. Other obviously significant factors include geographical features, organizational structures, management principles and utilization of facilities. Nor is the issue sameness. The defendants contend that the requirement that the system provide substantially equal educational opportunities would "squelch innovation." Given the very nature of education, an adequate system, by all reasonable standards, would include innovative and progressive features and programs. The defendants also contend that application of equal protection principles to education would "quickly lower the quality of education in the state to the lowest common denominator." That surely is not the meaning or purpose of either the equal protection or education provisions of the constitution.

The power of the General Assembly is extensive. The constitution contemplates that the power granted to the General Assembly will be exercised to accomplish the mandated result, a public school system that provides substantially equal educational opportunities to the school children of Tennessee. The means whereby the result is accomplished is, within constitutional limits, a legislative prerogative. Consequently, the trial court's holding that the appropriate remedy should be fashioned by the General Assembly is affirmed.

The judgment of the Court of Appeals is reversed, and this matter is remanded to the trial court for the assessment of costs

and such other proceedings that may be necessary.

The costs of this appeal are taxed one-half against the defendants and one-half against the intervenors.

DROWOTA, O'BRIEN, DAUGHTREY, and ANDERSON, JJ., concur.