Alice Sue BROWN, Plaintiff–Appellee,

v.

CAMPBELL COUNTY BOARD OF EDU-
CATION, Larry Brinton, Jr., Director of
the Division of Workers' Compensation,
Tennessee Department of Labor, Second
Injury Fund, State of Tennessee and
Charles Burson, Attorney General for
the State of Tennessee, Defendants–Ap-
pellants.

Brenda HARLESS, Plaintiff–Appellee,

v.

HUNTSVILLE MANOR NURSING
HOME, STATE OF TENNESSEE and
Charles Burson, Attorney General for
the State of Tennessee, Defendants–Ap-
pellants.

Supreme Court of Tennessee,
at Knoxville.

Dec. 28, 1995.

Rehearing Denied Feb. 5, 1996.

David H. Dunaway, David H. Dunaway and Associates, LaFollette, for Plaintiffs–Appellees Brown and Harless.

J. Anthony Farmer, Tennessee Trial Lawyers Association, Knoxville, for Amicus Curiae.

R. Franklin Norton and Gary G. Spangler, Knoxville, for Defendant–Appellant Huntsville Manor Nursing Home.

Charles W. Burson, Attorney General and Reporter Diane Stamey Dycus, Senior Counsel, Nashville, for all Other Defendants–Appellants.

## OPINION

WHITE, Justice.

In these consolidated workers' compensation appeals, we must determine whether Tennessee Code Annotated Sections 50–6–241 and 50–6–242, which set out the methods used to determine permanent partial disability benefits, violate the equal protection provisions of the Tennessee or United States Constitutions. Additionally, at issue is whether Tennessee Code Annotated Section 50–6–241 conflicts with the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* or Section 794 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* For the reasons explained below, we hold that Tennessee Code Annotated Sections 50–6–241 and –242 do not violate equal protection and that Section 50–6–241 does not violate the cited federal statutes.

## FACTS AND BACKGROUND

### I. *Harless* Case

Plaintiff, Brenda Harless, is a high-school graduate who has held jobs as a nurse's aid, waitress, maid, druggist's assistant, and factory worker. At the time of trial, she was thirty-four years old. On January 16, 1993, Harless injured her back lifting a patient in the course and scope of her employment as a nurse's aid for defendant employer, Huntsville Manor Nursing Home. Harless was treated by Dr. Robert Finelli, a neurosurgeon, who recommended physical therapy and a work hardening program after detecting a bulging disk. On June 14, 1993, Dr. Finelli released Harless to return to work as a nurse's aid with a lifting restriction of twenty-five pounds for four weeks, followed by a return to full and regular duty. He assessed an anatomical impairment of 2 to 3% to the whole body. After Harless was released by Dr. Finelli, Huntsville Manor offered to put her back to work at the same rate of pay she was making when she was injured. Harless did not respond to this offer because she was not feeling well enough to return to work. She did, however, attempt to work as a cashier at a convenience

store, a less physically demanding job than the one she had at the nursing home, but was not able to complete a full shift due to back pain.

In April, 1994, Harless was referred by her lawyer to Dr. William Kennedy, an orthopedic surgeon. Dr. Kennedy saw Harless on one occasion and diagnosed a herniated disk. In Dr. Kennedy's view, a herniated disk is synonymous with a bulging one, the condition diagnosed by Dr. Finelli. Dr. Kennedy opined that Harless had not been physically able to work since her back injury on January 16, 1993. He recommended that she not return to "any type of work that would require lifting greater than twenty-five pounds at a time or six pounds constantly, and that she should not do any work that would require vigorous pushing or pulling." Dr. Kennedy assigned a 14% whole body anatomical impairment rating.

In addition to Doctors Finelli and Kennedy, Harless consulted with Dr. Larry Wolfe, a family practitioner. Dr. Wolfe began treating Harless on January 31, 1994, for psychiatric problems, specifically depression and anxiety. Dr. Wolfe found her "extremely disabled" on account of emotional difficulties stemming from the back injury and her resulting inability to work and support her family. Dr. Wolfe was unable to provide a numerical percentage of mental impairment or a percentage of anatomical impairment reflecting Harless's pain under the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993) ("AMA Guides") because the AMA Guides provide no such percentages.

Two vocational experts testified as well. Dr. Norman Hankins testified that Harless was 100% vocationally disabled due to her back injury and mental condition. Dr. Craig Colvin gave Harless a 20 to 25% vocational disability rating.

## II. *Brown* Case [1]

Alice Brown, the plaintiff in the consolidated case on appeal, was fifty years old at the time of trial. She has a high-school education and has completed some college study. For approximately ten years, Brown worked in food service for the defendant employer, Campbell County Board of Education. On October 6, 1992, while trying to open a steam table in the kitchen at the elementary school where she worked, Brown suffered injuries to her neck and shoulder. Later that month Brown was injured again when she fell on her buttocks while taking inventory in the stock room at the school.

Brown's family physician, Dr. Lee Durham, a family practitioner, opined that Brown's work-related injuries aggravated her pre-existing emotional problems of severe and chronic depression. Dr. Durham could not provide a percentage of permanent mental disability under the AMA Guides because the Guides provide no such numerical percentages. Brown could, however, be classified as having "marked impairment" under the AMA Guides due to her psychological problems.[2]

Realizing that Brown's back and neck conditions needed specialty care, Dr. Durham referred her to a neurosurgeon, Dr. Eugenio Vargas. Dr. Vargas first saw Brown in December, 1992. After extensive testing, Dr. Vargas found "disk abnormalities," but felt that Brown's back and neck problems were "muscular-ligamentous" in nature and did not require surgery. Dr. Vargas found no objective indication that Brown had suffered a permanent injury as a result of the October 1992 work incidents. Consequently, he assessed no anatomical impairment, and referred Brown back to Dr. Durham for physical therapy.

Dr. William Kennedy, the same orthopedic surgeon that evaluated Harless, also evaluated Brown. Dr. Kennedy assessed an anatomical impairment rating of 21% to the whole body as a result of Brown's back and

---

**1.** No trial transcript or statement of evidence has been filed by the parties. The facts, as recited herein, are based upon the pleadings and stipulated medical records and testimony found in the record.

**2.** The AMA Guides define "marked impairment" as "a level of impairment that significantly impedes useful functioning." AMA Guides at § 14.7.

neck conditions.[3] According to Dr. Hankins, her vocational disability following the October injuries is at least 95%.

### III. Trial Court's Findings

In the *Harless* case, the chancellor found that Harless was 86% permanently disabled. He attributed 56% of the permanent disability to the back injury and 30% to the resulting emotional condition. In the *Brown* case, the chancellor found 90% permanent partial disability to the whole body, with 60% (56% physical and 4% emotional) attributable to the first injury in October, 1992, and 30% (28% physical and 2% emotional) to the second injury. In both cases, the chancellor found that Tennessee Code Annotated Section 50–6–241(a)(1) and (c) was unconstitutional. Specifically, the court found Section 241(a)(1) to be

"arbitrary, capricious, illegal, and unconstitutional because it violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and unfairly discriminates between workers whose medical problems are recognized by the [AMA Guides] and those whose problems are not, such as mental trauma and chronic pain syndrome."

The court went on to declare the provision as violative of equal protection

in that it provides workers who return to the same employment with less disability than those workers who do not return to the same employment.

As to Section 241(c), the court based its finding of unconstitutionality on the unrea-sonable classification of workers with AMA recognized injuries and those whose injuries are not AMA recognized. Therefore, the court concluded that "this statute unfairly discriminates between workers whose medical problems are recognized by the [AMA Guides] and those whose problems are not."

Finally, the court declared Section 241(c) to be unconstitutional

because the statute requires that the multipliers established by T.C.A. Section 50–6–241(a) and T.C.A. Section 50–6–241(b) be maximum limits. The Court further finds that the ratings in the [AMA Guides] have nothing whatever to do with the inability to work. In the real world of an actual work injury, a worker with a slight impairment might be (given the nature of his occupation) completely unable to continue in his trade, while another worker might suffer a more serious injury and yet (because of the nature of his or her occupation) be able to continue working. Incorporation of the [AMA Guides] into the statutory scheme of the Tennessee Workers' Compensation Act in spite of these truths is therefore arbitrary, capricious, and irrational.

In the *Brown* case, the chancellor also held Section 232 unconstitutional because it discriminates between educated and uneducated workers.

### *ANALYSIS*
#### I. The Statutes in Question

Reduced to its essentials, Tennessee Code Annotated Section 50–6–241[4] establishes

---

3. Plaintiff refers to a 95% vocational impairment rating given by Dr. Norman Hankins in her brief. No affidavit, report, or deposition of Dr. Hankins appears in the record.

4. The statute provides in part:

(a)(1) For injuries arising on or after August 1, 1992, in cases where an injured employee is eligible to receive any permanent partial disability benefits ... and the pre-injury employer returns the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of injury, the maximum permanent partial disability award that the employee may receive is two and one-half (2½) times the medical impairment rating determined pursuant to the provisions of the American Medical Association Guides to the

Evaluation of Permanent Impairment (American Medical Association), the Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impairment (American Academy of Orthopedic Surgeons), or in cases not covered by either of these, an impairment rating by any appropriate method used and accepted by the medical community. In making determinations, the court shall consider all pertinent factors, including lay and expert testimony, employee's age, education, skills and training, local job opportunities, and capacity to work at types of employment available in claimant's disabled condition.

\* \* \* \* \* \*

(b) Subject to factors provided in subsection (a) of this section, in cases for injuries on or after August 1, 1992, where an injured employ-

maximum permanent disability awards for employees based on the medical impairment rating and multipliers selected by the legislature. The medical impairment rating must be determined in accordance with specific guides and manuals, or if not covered by those, by any "appropriate method used and accepted by the medical community." The maximum permanent partial disability award an employee may received depends on whether the employee is returned to work after injury at an equal or greater wage than at the time of injury. In setting an award, the court must consider all relevant factors, including lay and expert testimony, the employee's age, education, skills, training, local job opportunities, and the employee's capacity to work at the types of employment available to the employee in the employee's disabled condition. Tenn.Code Ann. § 50–6–241(a)(1), (b) & (c) (1995 Supp.). Moreover, the multipliers are maximum caps. Tenn. Code Ann. § 50–6–241(c) (1995 Supp.).

Notwithstanding these maximums found in Section 241, Section 242 [5], the other statute found to be unconstitutional by the chancel-

lor, authorizes an award in these caps in situations in which the employee is eligible for a maximum award and establishes three of four conditions pertaining to age, education, job skills, and local job opportunities. Tenn.Code Ann. § 50–6–242 (1995 Supp.).

## II. Applicable Constitutional Standards

Both the United States and Tennessee Constitutions guarantee to citizens the equal protection of the laws. The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." In two separate provisions, applicable in different circumstances, our state Constitution provides an equal protection guarantee. *State v. Tester,* 879 S.W.2d 823, 827 (Tenn.1994); *Tennessee Small School Sys. v. McWherter,* 851 S.W.2d 139, 152 (Tenn.1993). The first provision found in Article 1, Section 8, known as the "law of the land" clause, provides that individuals shall not be deprived of

ee is eligible to receive permanent partial disability benefits ... and the pre-injury employer does not return the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of injury, the maximum permanent partial disability award that the employee may receive is six (6) times the medical impairment rating determined pursuant to he provisions of the American Medical Association Guides to the Evaluation of Permanent Impairment (American Medical Association), the Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impairment (American Academy of Orthopedic Surgeons), or in cases not covered by either of these, an impairment rating by any appropriate method used and accepted by the medical community. In making such determinations the court shall consider all pertinent factors, including lay and expert testimony, employee's age, education, skills and training, local job opportunities, and capacity to work at types of employment available in claimant's disabled condition.

(c) The multipliers established by subsections (a) and (b) are intended to be maximum limits. If the court awards a multiplier of five (5) or greater, then the court shall make specific findings of fact detailing the reasons for awarding the maximum impairment. In making such determinations, the court shall consider all pertinent factors, including lay and expert testimony, employee's age, education,

skills and training, local job opportunities, and capacity to work at types of employment available in claimant's disabled condition.
Tenn.Code Ann. § 50–6–241(a)(1), (b) and (c) (1995 Supp.).

**5.** The statute provides:

Notwithstanding any provision of this chapter to the contrary, the trial judge may award employees permanent partial disability benefits, not to exceed four hundred (400) weeks, in appropriate cases where permanent medical impairment is found and the employee is eligible to receive the maximum disability award under § 50–6–241(a)(2) or (b). In such cases the court, on the date of maximum medical improvement, must make a specific documented finding, supported by clear and convincing evidence, of at least three (3) of the following four (4) items:

(1) The employee lacks a high school diploma or general equivalency diploma or the employee cannot read or write on a grade right (8) level;

(2) The employee is age fifty-five (55) or older;

(3) The employee has no reasonably transferable job skills from prior vocational background and training; and

(4) The employee has no reasonable employment opportunities available locally considering the employee's permanent medical condition.

liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of ... life, liberty or property but by the judgment of ... peers or the law of the land.

Tenn. Const. Art. I, § 8. The second relevant Tennessee constitutional provision, Article XI, Section 8, reads in part:

General laws only to be passed.—The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie, [immunities] or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

We have consistently held that these two provisions confer the same protections as does the Fourteenth Amendment to the United States Constitution. *State v. Tester,* 879 S.W.2d at 827; *Tennessee Small School Sys. v. McWherter,* 851 S.W.2d at 152. Thus, in analyzing equal protection challenges, we have followed the analytical framework developed by the United States Supreme Court, which, depending on the nature of the right asserted, applies one of three standards of scrutiny: (1) strict scrutiny, (2) heightened scrutiny, and (3) reduced scrutiny, applying the rational basis test. *State v. Tester,* 879 S.W.2d at 828; *Tennessee Small School Sys. v. McWherter,* 851 S.W.2d at 153.

■ The parties here disagree on the applicable level of scrutiny. Defendants urge the court to apply a reduced scrutiny standard, examining the statutes under rational basis test. Plaintiffs argue that strict scrutiny should apply, at least as to Section 242 which distinguishes between educated and uneducated workers. Thus, plaintiffs contend that the statute unduly hinders the pursuit of education because its provisions result in educated workers receiving smaller awards.

■ Strict scrutiny applies to those classifications "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment or relegated to such a position of political powerlessness as to command extraordinary protection ... and thus be denominated a suspect class" so as to invoke a strict scrutiny analysis. *Newton v. Cox,* 878 S.W.2d 105, 109 (Tenn.1994) (quoting *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973)). Educated persons do not meet the definition of a suspect class. Further, the statute is simply a reflection of the common law which recognizes the level of education as a legitimate factor in determining vocational disability. *Roberson v. Loretto Casket Co.,* 722 S.W.2d 380, 384 (Tenn.1986) ("The assessment of ... disability is based upon numerous factors, including the employee's ... education...."). It does not abridge a fundamental right nor does it distinguish between persons on a suspect basis. *Newton v. Cox,* 878 S.W.2d at 109. Consequently, we hold that the appropriate standard for assessing the constitutionality of the statutes in question is the reduced scrutiny standard employing the rational basis test.[6]

■ Compared to heightened and strict scrutiny, the reduced scrutiny test imposes upon those challenging the constitutionality of a statute the greatest burden of proof. *Tennessee Small School Sys. v. McWherter,* 851 S.W.2d at 153. The test has been described as follows:

The concept of equal protection espoused by the federal and our state constitutions guarantees that 'all persons similarly circumstanced shall be treated alike.' Conversely, things which are different in fact or opinion are not required by either constitution to be treated the same. The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States, and legislatures are given considerable latitude in determining what groups are different and what

---

**6.** Previous equal protection challenges to the workers' compensation act have been analyzed by this Court using the rational basis test. *See*

*e.g., Kelley v. 3–M Co.,* 639 S.W.2d 437 (Tenn. 1982).

groups are the same. In most instances the judicial inquiry into the legislative choice is limited to *whether the classifications have a reasonable relationship to a legitimate state interest.*

*State v. Tester,* 879 S.W.2d at 828 (emphasis in original) (quoting *Tennessee Small School Sys. v. McWherter,* 851 S.W.2d at 153). Thus, if a reasonable basis exists for the difference in treatment under the statute, or if any set of facts can reasonably be conceived to justify it, the statute is constitutional. *Id.; see also Newton v. Cox,* 878 S.W.2d at 110. Equal protection does not require absolute equality. Nor does it mandate that everyone receive the same advantages. *Tennessee Small School Sys. v. McWherter,* 851 S.W.2d at 153 ("If [the different treatment] has a rational basis, it is not unconstitutional merely because it results in some inequality.") (quoting *Harrison v. Schrader,* 569 S.W.2d 822, 825 (Tenn.1978)); *see also Genesco, Inc., v. Woods,* 578 S.W.2d 639, 641 (Tenn.1979). Unless the individual challenging the statutes can establish that the differences are unreasonable, the statute must be upheld. *Tennessee Small School Sys. v. McWherter,* 851 S.W.2d at 154 (quoting *Harrison v. Schrader,* 569 S.W.2d at 826).

■ While no bright line rule for determining reasonableness exists, there are some helpful parameters. The classification must be naturally and reasonably related to that which it seeks to accomplish. Some reason to distinguish and prefer the particular individual or class must exist.

*There must be reasonable and substantial differences in the situation and circumstances of the persons placed in different classes which disclose the propriety and necessity of the classification. If legislation arbitrarily confers upon one class benefits, from which others in a like situation are excluded, it is a grant of a special right, privilege, or immunity, prohibited by the Constitution, and a denial of the equal protection of the laws to those not included. . . . The fundamental rule is that all classifications must be based upon substantial distinctions which make one class really different from another; and the characteristics which form the basis of the classification must be germane to the purpose of the law. . . .*

*State v. Tester,* 879 S.W.2d at 829 (emphasis in original).

## III. Application of Standards to Cases

The trial court's findings that Sections 241 and 242 violate equal protection are based on conclusions that three classifications were discriminatory. First, the court found a discriminatory classification based on the workers whose medical problems are recognized by the AMA Guides and those whose are not. Second, the court held that the statute discriminates between workers who are able to return to work and those who cannot. Third, the court found that Section 242 unconstitutionally discriminates between workers based on education level. Plaintiffs and amicus, the Tennessee Trial Lawyers Association, allege the same equal protection violations. We, thus, turn to the crucial question of whether the classifications bear a reasonable relationship to any legitimate state interest; that is, whether the challenged statutes satisfy the rational basis test.

### A. The Caps/Multipliers

■ Rather than challenging the rationality of the caps, or maximum multipliers, on permanent partial disability, plaintiffs challenge the method used to arrive at the impairment rating which, under the statute, is used in conjunction with the multipliers to determine the maximum award. Nonetheless, we begin our inquiry with that threshold question: Are the caps, or multipliers, contained in Section 241 rationally based?

A valid criticism of our workers' compensation system prior to the 1992 reforms which included the challenged statutes was that awards for similar impairments varied widely across the state. The multipliers substantially reduce the possibility of similarly situated workers with like injuries and anatomical disability ratings receiving vastly different awards. Reasonable uniformity in statutory awards is a legitimate state interest.

Additionally, the caps provide employees, employers and their insurers with a measure of predictability since all awards have defined outer limits. Predictability in the law is

obviously a desirable and legitimate legislative objective, one that serves the interests of the parties, bench, and bar. In addition to providing a degree of uniformity and predictability, the caps serve the state's interest in keeping workers' compensation insurance premiums from escalating to the point that industry cannot afford them, a well-known factor driving the reforms of 1992. *Newton v. Cox*, 878 S.W.2d at 110 ("It is conceivable that the General Assembly concluded that the contingency cap [on attorney's fees in medical malpractice cases] would further the purposes the Medical Malpractice Act by reducing malpractice insurance costs...."). Finally, it is important to note that the caps are not absolute and do not apply in every case. Tenn.Code Ann. § 50–6–242 (1995 Supp.). Trial courts have the discretion to exceed the caps in cases where the disabled employee faces the substantial vocational obstacles specifically set out in Tennessee Code Annotated Section 50–6–242.[7]

### B. Use of the AMA Guides

■ Plaintiffs argue that the use of the AMA Guides as contemplated by Tennessee Code Annotated Section 50–6–241 violates equal protection because (1) numerical percentage ratings are not provided for certain medical conditions, such as mental impairment or chronic pain, (2) factors other than a physician's interpretation of anatomical impairment are not considered in determining vocational disability and, (3) the AMA Guides themselves caution against their exclusive use in fashioning awards of vocational disability.

Plaintiffs' assertions about the Guides are largely accurate. The Guides do not provide percentage ratings for some physical and mental impairments. *See, e.g.,* AMA Guides at §§ 14.7 (behavioral and mental disorders) & 15.8 (pain conditions).[8] Additionally, the Guides caution against their exclusive use in determining vocational disability.

The critical problem is that no formula is known by which knowledge about a medical condition can be combined with knowledge about other factors to calculate the percentage by which the employee's industrial use of the body is impaired. Accordingly, each commissioner or hearing official must come to a conclusion on the basis of assessment of the available medical and nonmedical information. The Guides may help resolve such a situation, but it cannot provide complete and definitive answers. Each administrative or legal system that uses permanent impairment as a basis for disability ratings should define its own means for translating knowledge about an impairment into an estimate of the degree to which the impairment limits the individual's capacity to meet personal, social, occupational, and other demands....

It must be emphasized and clearly understood that impairment percentages derived according to [the] Guides criteria should not be used to make direct financial awards or direct estimates of [vocational] disabilities.

AMA Guides at § 1.5.

Our recognition that the system is imperfect does not mean that it is unconstitutional. The reasonable and legitimate state interests applicable to the multipliers—uniformity,

---

7. As an aside, we note that the workers' compensation scheme is replete with caps established by the legislature. The caps established for permanent partial disability in Tennessee Code Annotated Section 50–6–241 is analogous in principle to the maximum benefits provided for in Tennessee Code Annotated Section 50–6–207(3) for injuries to scheduled members; the 400 week cap on permanent partial disability benefits contained in Tennessee Code Annotated Section 50–6–242; the 260 week limit on permanent total disability for injuries which occur after age sixty in Tennessee Code Annotated Section 50–6–207(4); the cap of 400 weeks on temporary partial disability in Tennessee Code Annotated Section 50–6–207(2); the limits on death benefits as provided for in Tennessee Code Annotated Section 50–6–

210; and the 20% cap on attorney's fees in Tennessee Code Annotated Section 50–6–226(a).

8. The Guides rate mental impairment on a five level scale that ranges from no impairment to extreme impairment (none, mild, moderate, marked, and extreme). AMA Guides at § 14.7. Each level is specifically defined. *Id.* As to pain, impairment percentages for organ systems include pain that may accompany the impairing condition. *Id.* at § 2.2; otherwise, pain can be classified under the Guides as minimal, slight, moderate, or marked. *Id.* at § 15.8. Each of these levels is also specifically defined by the Guides. *Id.*

fairness and predictability—are equally applicable to the use of the Guides. *See* Tenn. Code Ann. § 50–6–204(d)(3) (1995 Supp.) ("To provide *uniformity and fairness for all parties,* any medical report prepared by a physician furnishing medical treatment to a claimant shall use [The AMA Guides].") (emphasis added). The Guides themselves acknowledge that their use "increases objectivity and enables physicians to evaluate and report medical impairment in a standardized manner, so that reports from different observers are more likely to be comparable in content and completeness." AMA Guides at § 1.7. Thus, the legislation is reasonably related to and accomplishes significant state interests.

If the Guides were not used, medical opinions would be more subjective, and perhaps, arbitrary. It is no surprise, therefore, that most states either mandate, recommend, or frequently use the Guides in workers' compensation cases. *Id.* at § 1.4. Tennessee is no exception. Even before Tennessee Code Annotated Section 50–6–241 was enacted, this Court upheld the use of the Guides as proper evidence of disability. *Harness v. CNA Ins. Co.,* 814 S.W.2d 733 (Tenn.1991).

Plaintiffs argue that workers whose injuries are not covered by the Guides receive no benefits. This is simply not true. The Guides provide *anatomical* impairment ratings expressed in a percentage. The workers' compensation statutes award benefits not for medical impairment but for vocational disabilities. *Jefferson County Schools v. Headrick,* 734 P.2d 659 (Colo.Ct.App.1986) (employee was entitled to vocational disability benefits for hearing loss even though the AMA Guides provided no percentage of anatomical impairment for such an injury); *Dayron Corp. v. Morehead,* 509 So.2d 930 (Fla. 1987) ("[T]he AMA Guides are inapplicable when ... they preclude a finding of permanent impairment where the claimant suffered a disability ... which permanently impairs his ability to work...."). Our legislature has recognized that the Guides do not cover all types of injuries. When the injury in question is not covered by the Guides, the rating is to be based on "any appropriate method used and accepted by the medical

community." Tenn.Code Ann. § 50–6–241(a)(1) & (b) (1995 Supp.). Thus, a medical expert can still provide an impairment rating based upon the expert's training and experience consistent with methods used and accepted by the medical profession. *Accord Dayron Corp. v. Morehead,* 509 So.2d at 931 ("When an injury is not covered by the AMA Guides, it is permissible to rely upon medical testimony of permanent impairment based upon other generally accepted medical standards."). Because the legislature has provided a reasonable rating alternative for medical conditions not included in the Guides, plaintiffs' argument that those whose conditions not covered by the Guides are discriminated against is without merit.

Contrary to plaintiffs' assertions, the Guides are not the sole determining factor in setting an award of vocational disability. Tennessee Code Annotated Section 50–6–241 explicitly requires courts to "consider all pertinent factors, including lay and expert testimony, employee's age, education, skills and training, local job opportunities, and capacity to work at types of employment available in claimant's disabled condition." Tenn.Code Ann. § 50–6–241(a)(1), (b) & (c) (1995 Supp.). These factors must be considered regardless of whether the employee's medical condition is rated by the Guides. While physical impairment is a factor that has some bearing on the ultimate issue of vocational disability, *Corcoran v. Foster Auto GMC, Inc.,* 746 S.W.2d 452, 459 (Tenn.1988), this Court has distinguished between anatomical impairment and vocational disability. *Perkins v. Enterprise Truck Lines, Inc.,* 896 S.W.2d 123, 125 (Tenn.1995).

The statutory scheme is consistent with our recognition that the extent of vocational disability is a separate, distinct issue from the extent of physical impairment. *Worthington v. Modine Mfg. Co.,* 798 S.W.2d 232, 234 (Tenn.1990); *Davenport v. Taylor Feed Mill,* 784 S.W.2d 923, 925 (Tenn.1990); *Corcoran v. Foster Auto GMC, Inc.,* 746 S.W.2d at 457. The statute fulfills legitimate state interests and does not discriminate against those whose disabilities must be rated by a method other than the Guides.

## C. Return to Work/Education Level Distinction

■ Again, plaintiffs are correct in their assertions that the statute distinguishes between workers who are able to return to work and those who cannot and between workers with various levels of education. Making a distinction does not necessarily result in an equal protection violation. Defendants argue that the educational level distinction is reasonable because the less educated worker is likely to encounter greater difficulty re-entering the job market after an injury. We agree. The factors in Tennessee Code Annotated Section 50–6–242 merely recognize that older or less educated workers with no transferable job skills or no reasonable employment opportunities may have a higher vocational disability so as to warrant a higher workers' compensation award. The different treatment of workers who satisfy this criteria is based upon a reasonable difference. Thus, there is a rational basis for the distinction.

Similarly, it is reasonable to treat the worker who returns to work making as much or more than before the injury differently than the worker whose injuries prevent the return to work at the before-injury wage. The fact that a worker's income has declined is relevant to the determination of vocational disability. The statute allows the Court to consider the factor by allowing an increase in an award for such an employee. Indeed, even before Section 241 was enacted, the fact of re-employment after an injury was relevant in determining the extent of vocational disability. *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d at 459.

The statute is consistent with the common law. It encourages employers to retain injured workers at wages equal to or greater than wages received prior to the injury by providing for smaller disability awards if the employee is retained. Re-employment of injured workers is a legitimate state objective which justifies the distinction between those injured employees who are returned to work and those who are not. The distinction has a rational basis.

In sum, we hold that plaintiffs have failed to carry their burden of showing that Tennessee Code Annotated Sections 50–6–241 and 242 are not reasonably related to any legitimate state interests. *See Fritts v. Wallace*, 723 S.W.2d 948, 950 (Tenn.1987) (party attacking the constitutionality of statute must demonstrate its unconstitutionality); *see also Shelby Cty. Election Com'n v. Turner*, 755 S.W.2d 774, 777 (Tenn.1988) (if any reasonable construction satisfies constitutional requirements, courts have an obligation to uphold the statute); *Marion Cty. Bd. v. Marion Cty. Election Com'n*, 594 S.W.2d 681, 684 (Tenn.1980) (any doubt as to the constitutionality of a statute should be resolved in favor of finding it constitutional); *Dennis v. Sears, Roebuck & Co.*, 223 Tenn. 415, 446 S.W.2d 260, 263 (1969) (a strong presumption in favor of constitutionality exists when a statute is challenged).[9] The impairment rating model of Tennessee Code Annotated Sections 50–6–241 and 242, including the multipliers, use of the AMA Guides and the other factors in the statute, and the escape provisions in section 242, assist courts in determining the extent of vocational disability, provide a measure of uniformity and fairness, foster predictability, encourage employers to return injured employees to work, and may aid in controlling the rising costs associated with work-related injuries. The statutes are rationally based. They do not violate equal protection. Therefore, the trial court erred in finding the statutes unconstitutional.

## IV. Challenges Under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973

■ Although not raised below, plaintiffs assert on appeal that Tennessee Code Annotated Section 50–6–241 conflicts with the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Sec-

---

**9.** This Court has upheld various provisions of Tennessee's workers' compensation scheme against constitutional challenges. *See, e.g., Kelley v. 3–M Co.*, 639 S.W.2d 437 (Tenn.1982); *Nichols v. Benco Plastics, Inc.*, 225 Tenn. 334, 469 S.W.2d 135 (1971); *Mitchell v. Usilton*, 146 Tenn. 419, 242 S.W. 648 (1922); *Vantrease v. Smith*, 143 Tenn. 254, 227 S.W. 1023 (1921); *Scott v. Nashville Bridge Co.*, 143 Tenn. 86, 223 S.W. 844 (1920).

tion 794 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* The argument is based solely upon the claimed illegal discrimination between workers whose medical problems are recognized by the AMA Guides and those whose problems are not.

The pertinent provision of the ADA states:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participating in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1995 Supp.). The relevant section of the Rehabilitation Act of 1973, Section 794 (formerly Section 504), provides in part:

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or any program or activity conducted by any executive agency or by the United States Postal Service.

29 U.S.C. § 794 (1995 Supp.).

 In order to establish a claim under the Rehabilitation Act of 1973, plaintiff must demonstrate that he or she (1) has a disability recognized under the act; (2) is qualified for participation in the program; (3) is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of the disability; and (4) that the relevant *program or activity is receiving federal financial assistance. Thomas By and Through Thomas v. Davidson Academy,* 846 F.Supp. 611, 617 (M.D.Tenn.1994). To establish a claim under the ADA, a plaintiff must prove a similar set of elements. *Id.*

 Tennessee's workers' compensation system is obviously not operated by a federal executive agency. Moreover, there is no proof in the record that our workers' compensation system operates using federal

money. Thus, under its own terms, the Rehabilitation Act of 1973 is not applicable.

Regardless of applicability, the real flaw in plaintiffs' position is that Tennessee Code Annotated Section 50–6–241 provides permanent partial disability benefits to *all* injured workers with vocational disability, so long as there is work-related permanent impairment. It does not exclude any injured worker from receiving benefits based solely upon his or her disability. The fact that the AMA Guides do not provide percentages of impairment for every type of injury does not prevent a worker from recovering benefits. Section 241 explicitly provides alternate methods for determining impairment ratings for those injuries not recognized by the Guides. Thus, if the work-related medical problem resulting in permanent impairment is not covered by the Guides, the statute still provides a way for injured workers to establish entitlement to benefits. We find no basis for plaintiffs' claim that section 241 conflicts with so as to violate the federal statutes.

### V. Harless's Extent of Disability and Alleged Misrepresentation

 Having decided that neither Section 241 nor 242 violate equal protection, the ADA, or the Rehabilitation Act of 1973, we address the arguments of the employer in the *Harless* case concerning her extent of disability and purported misrepresentations on her employment application.[10] Huntsville Manor argues that Harless is barred from recovering for mental impairment because she misrepresented her mental condition on her employment application. To establish such a misrepresentation defense, the employer must establish that: (1) the employee knowingly and willfully made a false representation of her physical condition; (2) the employer relied upon that misrepresentation in making the decision to hire the employee; and (3) the misrepresentation was material in that there was a causal relationship between the false representation and the work-related injury sustained by the employee. *Berry v.*

---

**10.** Brown's employer, the Campbell County Board of Education, apparently does not contest the trial court's award of benefits. Brown's

award will not be disturbed on appeal, particularly in light of the fact that no transcript or statement of evidence has been filed.

*Consolidated Systems, Inc.*, 804 S.W.2d 445, 446 (Tenn.1991); *Shelton v. Clevepak Container Corp.*, 752 S.W.2d 508, 509 (Tenn. 1988).

As a part of her employment application, Harless completed a health examination form. She responded "no" to a question that asked ["h]ave you ever been treated for or ever had any known indication of . . . mental or nervous disorder?" Her family physician, Dr. Wolfe, testified that Harless had "nerve problems" preceding her employment with Huntsville Manor and had been taking anti-depression medication for these "nerve problems." Harless conceded as much at trial. Further, a psychological consultant's report dated September 13, 1993, indicated that "[s]he has been on the waiting list to receive psychotherapy at Ridgeview Psychiatric Center in Oneida, Tennessee, for the past few years." This report also states that "[t]he claimant reports that she began having problems with her nerves two years ago." Harless certainly knew that she had "been treated for or ever had any known indication of . . . a mental or nervous disorder."

The director of nursing at Huntsville Manor who hired Harless testified that he relied upon the truthfulness of the information contained in her questionnaire in hiring her, especially since the work she was being hired to do was "a very stressful job." Thus, the first two elements of the misrepresentation defense have been satisfied.

As to the third element of causation, defendant relies upon a statement by Dr. Wolfe that an individual with a nervous disorder would be more prone to injury or to a worsening of the nervous condition than someone without a nervous disorder. Dr. Wolfe did not testify that Harless' emotional problems were worsened by her work-related injuries.

His only testimony as to the indirect connection between emotional illness and injury proneness is too remote to establish causation between Harless' misrepresentation and her injury. Thus, defendant may not avail itself to the misrepresentation defense.

■ Defendant Huntsville Manor also claims that the two and one-half cap on benefits contained in Section 241 should apply because defendant offered to return Harless to a position consistent with her lifting restrictions at her pre-injury wage. *See* Tenn. Code Ann. § 50–6–241(a)(1) (1995 Supp.) (if "the pre-injury employer returns the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of injury, the maximum permanent partial disability award that the employee may receive is two and one-half (2½) times the medical impairment rating. . . ."). Defendant, therefore, urges the Court to find that Harless was constructively returned to work because she did not attempt to perform her duties. The problem with this argument is that it ignores whether Harless *could* return to work at the nursing home.[11] Her attempt to work at a much less physically demanding job after the injury was unsuccessful. Two physicians verified her inability to return to work. Based on this evidence, we conclude that Harless was not able to return to work on account of the severity of her physical and emotional injuries. Therefore, her refusal to return to the nursing home was reasonable, and the two and one-half cap is inapplicable. Had Harless unreasonably refused to return to work, the two and one-half cap would have applied.[12] Consequently, the trial court did not err in applying a multiplier of four to the

---

**11.** Taking the employer's argument to its logical conclusion, the two and one-half cap on benefits could always be triggered merely by the employer making an offer to return the employee to work, regardless of the employee's ability to work or the sincerity or genuineness of the offer.

**12.** *See Wheatley v. Camden Casting Center, Inc.*, No. 02S01–9503–CV–00025 (Special Workers' Compensation Appeals Panel decision adopted and affirmed by this Court on August 28, 1995) ("[A]n injured employee may not increase the

maximum allowable award by unreasonably refusing an employer's offer to return the employee to work at a job for which the employee is qualified and which the employee is able to perform within his restrictions."); *see also Bailey v. Krueger Ringier, Inc.*, No. 02S01–9409–CH–00061 (Special Workers' Compensation Appeals Panel decision adopted and affirmed by this Court on May 17, 1995) (A "meaningful" return to work is a sound construction of Tenn.Code Ann. § 50–6–241(a)(1).).

**420**

anatomical impairment rating provided by Dr. Kennedy.

 Finally, Huntsville Manor argues that the trial court erred in awarding 30% permanent partial disability for Harless's emotional injury because Dr. Wolfe did not provide a percentage of mental impairment. Instead, Dr. Wolfe opined that Harless was "extremely impaired mentally," and pointed out that the AMA Guides do not provide a numerical percentage rating for mental injuries. Dr. Wolfe was not asked to provide a percentage of impairment based on his training and experience, separate and apart from the AMA Guides, or one based on his training and experience taking into account the levels of mental impairment provided for in the Guides, all of which are specifically defined. Section 241 permits an impairment rating to be given "by any appropriate method used and accepted by the medical community" in circumstances in which the Guides do not apply. Neither party requested that Dr. Wolfe give an impairment rating other than one based on the AMA Guides. Consequently, the record does not contain a rating of Harless's mental impairment. However, because it is rather obvious from the record that Harless has sustained substantial mental impairment, we remand her case to the trial court for further proof on this point, after which the trial court shall fashion an appropriate award consistent with this opinion.

For the foregoing reasons, the judgment of the trial court is reversed in part, affirmed in part, and the case remanded. Costs shall be split evenly between the parties.

ANDERSON, C.J., and DROWOTA, REID, BIRCH, JJ., concur.