IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 19, 2006 Session

## C.S.C., ET AL. V. KNOX COUNTY BOARD OF EDUCATION, ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 157833-2     Daryl R. Fansler, Chancellor**

---

**No. E2006-00087-COA-R3-CV  - FILED DECEMBER 19, 2006**

---

In this class action lawsuit, the plaintiffs alleged that the defendants, the Knox County Board of Education and its superintendent, were guilty of statutory, regulatory, and constitutional violations in the design and implementation of the Board's evening alternative education program for students who are expelled or suspended from their regular schools. The trial court rejected the plaintiffs' challenges. The plaintiffs appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Dean Hill Rivkin and Brenda McGee, Knoxville, Tennessee, for the appellants, C.S.C., a minor, by his next friend and Mother, L.C., on behalf of C.S.C. and all others similarly situated, and M.A.M., a minor, by his next friend and Mother, B.M., on behalf of M.A.M. and all others similarly situated.

Martha Haren McCampbell, Knoxville, Tennessee, for the appellees, Knox County Board of Education, and Dr. Charles Lindsey, Superintendent.

**OPINION**

I.

In 2003, the named plaintiffs[1] filed this action for themselves and on behalf of all Knox County School students who had been or, in the future, would be, removed from their regular public schools because of disciplinary reasons for periods of time in excess of ten consecutive days. The complaint alleges that the defendants' failure to provide the plaintiffs with certain specified alternative education services during the students' periods of suspension violates sections of the

---

[1]Initials are being used in this litigation to preserve the anonymity of the plaintiffs.

Tennessee Code, state regulations, and the Tennessee and United States Constitutions. The complaint seeks damages, a judgment declaring the alleged violations, and injunctive relief. The trial court granted the plaintiffs' motion for class certification. The class consists of all students enrolled in Knox County Schools who were, or will be, suspended or expelled from school for more than ten consecutive days.

During the 2003-2004 school year, the defendants implemented an evening alternative education program at 12 school locations. The 2003-2004 program contemplated that a suspended/expelled student's regular classroom teacher would transmit the student's work to a teacher acting as the night program facilitator.

The plaintiffs filed suit challenging several aspects of the 2003-2004 night program and seeking a temporary injunction and other relief. This earlier program lacked subject matter instruction. In addition, there was an administrative problem in transmitting a student's assignments back and forth between a student's regular teacher and the night program facilitator. Following a hearing on August 12, 2003, the trial court held, *inter alia*, (1) that the defendants were enjoined from implementing an evening alternative education program for middle school students because, as found by the court, the legislature had not authorized such a program; and (2) that, contrary to the plaintiffs' assertions, the defendants were not required to provide students with transportation to and from the sites of the evening alternative schools. The trial court reserved ruling on the issue raised by the plaintiffs as to whether the evening program, as designed by the defendants, conflicted with minimum state requirements.

In the summer of 2004, the defendants implemented a revised evening alternative education program for the 2004-2005 school year. As particularly pertinent, the 2004-2005 program introduced subject matter instruction. The program utilizes a computer program called "Plato," an interactive program that provides self-paced instruction for the students. The students in the night program spend the entire class time – which is approximately three hours a night for four nights a week – working on the computer with the Plato program. The night program facilitators, who are licensed and certified teachers, remain onsite and assist the students in using the computer program. The 2004-2005 program was initially held at 12 locations. However, in February, 2005, the defendants reduced the availability of the program to four central locations. The defendants claim that the decision to reduce the number of locations was made in an effort to remedy several problems with the program, including serious staffing and security concerns. At present, the defendants operate an alternative education program at five locations, *i.e.*, the four night programs and a day program, the latter at Richard Yoakley School.

Because the 2003-2004 night program had been abandoned in favor of the new program, the parties reached a partial settlement agreement with respect to the earlier program. The agreement sets forth various remedies available to any members of the class who were adversely affected by the 2003-2004 program.

In August, 2004, the plaintiffs filed a motion for a temporary injunction, alleging that the defendants' 2004-2005 night alternative education program violates state and federal law (1) by offering less than 12 hours of instruction per week, (2) by failing to provide instruction in all of the core courses, (3) by failing to provide support services, such as counseling, anger management, and other psychological services, and (4) by failing to offer a curriculum focused on reforming the students' behavior. On April 7-8, 2005, the trial court held a hearing to address the plaintiffs' challenges to the 2004-2005 night program. The trial court made the following observations and findings of fact:

> Counsel for the parties have stipulated that as of April 8, 2005, during the 2004-2005 school year, 445 students had been suspended from the Knox County schools for greater than ten days. It is further stipulated that approximately 239 of those students did not attend or enroll in alternative school programs during the 2004-2005 school year and further stipulated that there is nothing in the record to show or explain why those students did not attend or enroll and the Court draws no inferences therefrom.

> At the trial of this cause, [the] plaintiffs offered testimony from parents and relatives of students who had been suspended for more than ten days. The testimony of those parents, as well as interrogatory answers of the defendants, establish that the defendants did not offer to students suspended over ten days behavioral support services such as psychological counseling, social work services, drug and alcohol abuse programming or anger management instruction in its 2004-2005 [night alternative education program ("NAP")]. The only exception was for students from Bearden High School []. Witness S.L. testified that her grandson who attended Bearden High School and who was in the NAP was not offered any behavioral support services.

> Numerous parents and relatives testified that no curriculum involving behavioral instruction was offered in the NAP.

> At least three witnesses testified that their students who were suspended for Zero Tolerance violations (180 school days) were placed in the NAP program and were never placed in the daylong program at [Richard Yoakley School].

> Numerous parent/relative witnesses testified that the curriculum provided in the NAP [was] inadequate. References to these witnesses will be by their initials in order to protect the identity of the students involved.

-3-

C.T. testified that there were no teachers in NAP and no Plato computer programming for courses in NAP. R.C. testified that only one course was offered in NAP for both of her daughters. S.L. testified that Bearden High School failed to provide her grandson coursework for subjects not offered on the Plato computer program. D.K. testified that NAP was not equipped to offer any base school courses such as science lab, foreign language and that there were problems with obtaining coursework from the base school teachers. This witness further complained that there were no base school teachers at NAP to explain coursework and that she was required to hire private tutors to provide education at NAP. K.B. testified that the Plato science course did not include a lab component.

The daylong [alternative education] program at [Richard Yoakley School] is 6 1/2 hours, five days per school week. It has a behavioral program and social skills curriculum designed to help suspended and expelled students make good decisions. It is offered to all students in the program. [Richard Yoakley School] has classrooms for 40 regular education students suspended for over ten days.

In the Knox County Schools the students' instructional program in his or her base school is predominantly provided by teachers certified, or having expertise, in the subject matter that they teach. Those students attend school for 6 1/2 hours per day, five days per week. In order to be counted present at the base school the student must be present at school for a minimum of 3 hours and 15 minutes each day.

Edwin Hedgepeth is the Director of Secondary Instruction for Knox County Schools and is responsible for the 2004-2005 NAP. Mr. Hedgepeth was unaware of any state curriculum to reform students to prevent them from being repeat offenders. He acknowledged that the 2002 NAP had been reduced from a four-hour program in 2003-2004 to a three-hour program in 2004-2005. He testified that the alternative education students are provided core curriculum courses. He acknowledged, however, that the core science courses in NAP did not provide science labs and that the county schools had not purchased Plato science simulation labs.

Foreign languages are not provided to suspended students. Neither are the students provided literature or composition as part of "language arts", a core subject. The suspended students also do not receive wellness, also a core course.

NAP does not include a curriculum for behavioral skills. There is no written policy for the provision of support services to students in NAP. Mr. Hedgepeth testified that he was unaware of any student who had been offered counseling or psychological services in NAP until the morning of trial. He nevertheless stated that if a student needed counseling or psychological services those services would be arranged through the base school or through services that were available to students in the base schools.

The Plato computer program used by the county has available programs that include CyberEd biology and chemistry labs.

All students who are suspended or expelled for more than ten days cannot attend the [Richard Yoakley School] day program because of space limitations. The board of education has a screening committee that determines which students are admitted to [Richard Yoakley School]. There are no set criteria for determining which students are placed in [Richard Yoakley School] but space is the driving criteria for placement.

Ms. Pat Williams, the principal for [Richard Yoakley School], testified that the committee first places students at [Richard Yoakley School], who were expelled pursuant to Zero Tolerance. Then the screening committee places those students with longer suspensions at [Richard Yoakley School] allowing students with suspensions of shorter duration to go to the NAP. Some students who are suspended long term are in the NAP program until space comes available in the day program.

Walter Mencer who also serves on the committee testified that the average stay in the NAP program before being moved to the day program was at most thirty or forty days. If a student with unique needs comes before the committee and the screening committee thinks there is a real need for them to be placed in the day program that need can be accommodated. This is accomplished by taking a student who has not served their full suspension and placing them back in their regular zoned school.

Dr. John McCook is Director of Pupil Personnel. Dr. McCook testified that Knox County has two labs on Plato, CyberEd biology and chemistry. The CyberEd biology includes a virtual dissection. Dr. McCook did not recall the exact date the CyberEd biology and

chemistry labs had been purchased but believed that they had been purchased this school year or the last.

Dr. McCook testified that research has shown that a student who spends two hours per subject per week on Plato will gain substantially in terms of their academic performance. He testified that this substantial gain would occur even in the absence of classroom instruction.

He described Plato as interactive and instructive. Plato allows a student to see where the errors are and keeps a data bank on how the student is progressing. If a student does not master material Plato directs them back to where he, or she, was having difficulty and re-teaches the material the student has not mastered. Plato is identified by the federal government as a scientifically based method under the No Child Left Behind Act.

Dr. Barbara Kacer is an Associate Professor at Western Kentucky University, whose area of expertise is in curriculum and instruction. She testified there [were] different ways to offer instruction such as teacher centered and learner centered. Dr. Kacer studied the Tennessee curriculum standards and testified that those standards mandated outcome not method of delivery.

Dr. Kacer testified that in her opinion the instruction in the [NAP] was adequate because it was standards based and there was access each night to certified teachers. She also testified that she believed the instruction given met the minimum curriculum standards set out in the Tennessee Curriculum Standards.

She also testified that academic learning time is about 10 hours out of a standard 32 1/2 hour school week. She felt that the amount of time lost in the NAP would be minimal because the students were not changing classes and only received one break.

Mr. Hedgepeth testified that the school system has recently purchased an online program which offers Spanish I and Spanish II. The program offers two full credits of Spanish. The school system has purchased additional online courses that are available to the students in English I through IV, Algebra I and II, Geometry, Pre-Calculus, Physical Science, Biology, Chemistry, Anatomy and Physiology, World Geography, World History, U.S. Government, U.S. History, Economics, Computer Applications and Career Management Success.

Martha Beaty Wiley is the Director of the Knox County Field Services Center for the state department of education. She works with 22 school systems in her region. She testified that in other areas of the state the Alternative School Programs have been monitored by the state board of education "based upon a request to the Commissioner" to do so.

She further testified that the only "seat time" requirement mandated by the state board of education applied to adult basic education and to summer school.

On September 2, 2005, the trial court filed its memorandum opinion rejecting the plaintiffs' challenges to the 2004-2005 night program. The court, however, did decree that members of the 2004-2005 class would have the same remedies as those made available to the students who were the beneficiaries of the partial settlement agreement pertaining to the 2003-2004 evening program. This appeal by the plaintiffs followed.

II.

The plaintiffs ask us to address four issues. Those issues, as taken verbatim from their brief, are as follows:

1. Did the [trial court] err in failing to grant declaratory and injunctive relief to members of the [p]laintiffs' class based on proof of violations by the [d]efendants of Tennessee statutes and State Board of Education regulations governing the provision of alternative education to students who are suspended from school?

2. Did the [trial court] err in failing to find that the [d]efendants violated the due process clauses of the Tennessee and United States Constitutions by arbitrarily placing certain suspended students in a full-time day alternative program, and, without meaningful procedures, placing other suspended students in a night alternative program that does not comply with state laws and regulations?

3. Did the [trial court] err in ruling that students were not entitled to transportation to any of the alternative programs run by the [d]efendants, despite the inability of students to obtain transportation to these schools?

4. Did the [trial court] err in ruling as moot the issue of whether students who are permanently dismissed from alternative school were

-7-

entitled to due process procedures under the United States and Tennessee Constitutions?

III.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual determinations that we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); ***Wright v. City of Knoxville***, 898 S.W.2d 177, 181 (Tenn. 1995); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are accorded no such presumption. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn. 1993).

IV.

The plaintiffs first argue that the trial court erred when it failed to find that the defendants' 2004-2005 night program violates various subsections of T.C.A. § 49-6-3402 and Tenn. Comp. R. & Regs. 0520-1-2-.09. T.C.A. § 49-6-3402 (Supp. 2006), which pertains to "alternative schools," provides, in relevant part, as follows:

> (a) Local boards of education may establish alternative schools for students in grades one through six (1-6) who have been suspended or expelled from the regular school program. At least one (1) alternative school shall be established and available for students in grades seven through twelve (7-12) who have been suspended or expelled as provided in this part. . . .
>
> (b) Alternative schools shall be operated pursuant to rules of the state board of education pertaining to them, and instruction shall proceed *as nearly as practicable* in accordance with the instructional programs at the student's home school. All course work completed and credits earned in the alternative schools shall be transferred to and recorded in the student's home school, which shall grant credit earned and progress thereon as if earned in the home school.
>
> (c) Attendance in an alternative school shall be voluntary unless the local board of education adopts a policy mandating attendance in either instance. The student shall be subject to all rules appertaining thereto. A violation of such rules by a student may result in the student's removal from this school for the duration of the original suspension or expulsion, but shall not constitute grounds for any extension thereof. The final decision on such removal shall be made by the chief administrator of the alternative school.

* * *

(f)(1) The state board of education in its rules and regulations for the operation of alternative schools shall require documentation of the reasons for a student attending such school and provide safeguards to assure that no child with disabilities or other special student is arbitrarily placed in such school. . . .

(2) The state board of education shall provide a curriculum for alternative schools to ensure students receive specialized attention needed to maximize student success. Alternative schools shall offer alternative learning environments in which students are offered a variety of educational opportunities, such as learning at different rates of time or utilizing different, but successful, learning strategies, techniques and tools.

(g) Notwithstanding any provision of this section or other law to the contrary, local boards of education may establish evening alternative schools for students in grades six through twelve (6-12).

(Emphasis added). Tenn. Comp. R. & Regs. 0520-1-2-.09, entitled "Alternative Schools," provides, in relevant part, as follows:

(1) Definition: An alternative school is a short term intervention program designed to develop academic and behavioral skills for students who have been suspended or expelled from the regular school program.

(2) Requirements:

(a) The instruction shall be *as nearly as practicable* in accordance with the instructional program in the student's regular school.

(b) All course work and credits earned shall be transferred and recorded in the student's regular school.

(c) Students are subject to all rules of the school system providing the alternative school. Violation of rules may cause students to be removed from the program but shall not constitute grounds for extending the length of original suspension or expulsion.

* * *

(f) Teachers must have a valid Tennessee teacher license.

(g) Support services such as counseling and psychological services must be accessible.

(Emphasis added).

The plaintiffs contend that the defendants' night alternative education program violates T.C.A. § 49-6-3402(b) and Tenn. Comp. R. & Regs. 0520-1-2-.09(2)(a) in that it fails to provide a curriculum and method of instruction that is "as nearly as practicable" to the curriculum and instruction provided in the regular school environment. To support this argument, the plaintiffs point to the fact that the night program does not offer instruction in all of the students' "core"[2] courses, and the fact that the night alternative education program only provides instruction 12 hours a week, as contrasted with regular school which provides 32.5 hours a week. In further support of this argument, the plaintiffs emphasize the night program's exclusive use of the "Plato" computer-based program for instruction, as opposed to the use of "live" instructors in the regular schools.

We first note that the curriculum offered by the night program, the period of instruction time, and the manner and method in which the instruction is provided do not run afoul of *express* provisions of either T.C.A. § 49-6-3402 or Tenn. Comp. R. & Regs. 0520-1-2-.09. For example, while the evidence supports the plaintiffs' argument that the defendants' night program does not offer instruction in all of the students' "core" courses, it is clear that the applicable statute and regulation do not *expressly* require alternative schools to offer instruction in all of the students' "core" courses. Furthermore, there is nothing in either of these provisions that *expressly* requires alternative education programs to operate for a specified period of time or to provide instruction from a "live" person, as opposed to a computer-based program. The real question, however, is whether the instruction provided by the defendants' night program is "as nearly as practicable" to the instruction provided in the regular school environment. We hold that it is.

In *State v. Marion County Bd. of Educ.*, 302 S.W.2d 57, 59 (Tenn. 1957), the Tennessee Supreme Court stated that

> Boards of Education, rather than Courts are charged with the important and difficult duty of operating the public schools. So, it is not a question of whether this or that individual judge or court considers a given regulation adopted by the Board as expedient. The Court's duty, regardless of its personal views, is to uphold the Board's regulation unless it is generally viewed as being arbitrary and

---

[2] Tenn. Comp. R. & Regs. 0520-1-3-.06(1)(b) provides that the "core curriculum" for high school students consists of the following: four units of English Language Arts, three units of Mathematics, three units of Science, three units of Social Studies, and one unit of Wellness.

-10-

unreasonable. Any other policy would result in confusion detrimental to the progress and efficiency of our public school system.

In *Morrison v. Hamilton County Bd. of Educ.*, 494 S.W.2d 770, 772 (Tenn. 1973), the High Court reiterated this sentiment by stating that

[t]he Legislature, feeling that it could not foresee all the numerous and perplexing problems that were to arise in the operation of the public schools, granted broad discretionary powers to the county Board of Education to make such rules and regulations for governing the public schools as the Board deems advisable, subject, only, to the requirement that they be "reasonable" and not discriminatory.

*See also* **Epperson v. Arkansas**, 393 U.S. 97, 104, 89 S. Ct. 266, 270, 21 L. Ed. 2d 228 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."). We recognize that these cases address facts quite different from those now before us; however, we believe they provide an over-arching principle that dictates how we are to approach the facts and issues presented in the instant case.

The defendants offered uncontroverted evidence that the instruction provided by the defendants' night program complies with all state education requirements. Dr. Barbara Kacer of the Western Kentucky University faculty testified that the instruction offered in the night program is "adequate" because it is "standards based" and because the students have access to certified teachers each night. According to Dr. Kacer, the night program's instruction meets the minimum state curriculum standards. Dr. Kacer pointed out in her testimony that only some ten hours of the regular 32.5-hour school week is actually spent on subject matter instruction. The other time, according to Dr. Kacer, is spent on administrative and student management tasks, *e.g.*, changing classes. Dr. Kacer found that the students in the night alternative education program do not lose much instruction time to miscellaneous tasks. The thrust of her testimony was that the 12 hours a week spent on instruction in the night program is consistent with the amount of time actually spent on instruction in the regular school environment. Furthermore, the night program facilitators, although they do not provide subject matter instruction, are licensed and certified teachers, and they are onsite and available to assist the students. The evidence does not preponderate against a finding that the instruction offered in the defendants' 2004-2005 night program compares "as nearly as practicable" to the instruction offered at a student's regular school.

The plaintiffs also argue that the defendants' 2004-2005 night program violates T.C.A. § 49-6-3402(f)(2) by failing to provide "behavioral instruction." Mr. Edwin Hedgepeth, the director of secondary instruction for Knox County Schools, testified that the night program did not provide a "behavioral skills" aspect in the curriculum. T.C.A. § 49-6-3402(f)(2), however, does not *expressly* require that alternative schools must provide "behavioral instruction" in its curriculum. It states that "[t]he state board of education shall provide a curriculum for alternative schools to ensure students receive specialized attention needed to maximize student success." As noted by the trial court,

T.C.A. § 49-6-3402(f)(2) requires the *state* board of education to provide a curriculum for alternative schools; the statute does not place the onus on *local* boards of education to perform this task. The defendants are not in violation of T.C.A. § 49-6-3402(f)(2).

Next, the plaintiffs argue that the defendants' 2004-2005 night program violates Tenn. Comp. R. & Regs. 0520-1-2-.09(2)(g) by failing to provide support services. The regulation at issue states that "[s]upport services such as counseling and psychological services must be *accessible*." (Emphasis added). In their answers to the plaintiffs' interrogatories, the defendants asserted that nine Bearden High School students who participated in the night program received behavioral support services, such as psychological counseling, social work services, drug and alcohol abuse counseling, and anger management instruction. Ms. Sallee Reynolds, the principal of West High School, testified that she recalled at least one night program student receiving behavioral assistance from a counselor. Ms. Reynolds and Mr. Hedgepeth both testified that, if a student requested or showed signs of needing such assistance, the student would be referred to a counselor. Although several witnesses testified that their child was not offered support services in the night program, the evidence, as a whole, does not preponderate against a finding that support services are "accessible" if needed. Accordingly, we hold that the defendants' 2004-2005 night program does not violate Tenn. Comp. R. & Regs. 0520-1-2-.09(2)(g).

V.

The plaintiffs next argue that the defendants' night program violates the due process clauses of the Tennessee and United States Constitutions by arbitrarily placing some suspended and expelled students in the night alternative education program and other suspended and expelled students in the day alternative education program at Richard Yoakley School.

The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law. . . ." Article I, section 8 of the Tennessee Constitution states that "no man shall be . . . deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." The phrase "law of the land" is synonymous with the phrase "due process of law" found in the Fourteenth Amendment. *State v. Hale*, 840 S.W.2d 307, 312 (Tenn. 1992).

The first question that arises in addressing this issue is whether the plaintiffs have identified a "liberty" or "property" interest that triggers the due process requirements. As the United States Supreme Court's teaching in *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972), makes clear,

> [t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*   *   *

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

The Tennessee Supreme Court has stated that Article XI, Section 12 of the Tennessee Constitution[3] guarantees the right to a free public education to the school children of this state. *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 151 (Tenn. 1993). We are not aware, however, of any authority creating a right to *alternative* education in and for a suspended or expelled student. T.C.A. § 49-6-3402(a) states that, for grades 7 through 12, "[a]t least one (1) alternative school shall be established and *available*." (Emphasis added). Neither the statute nor the regulation regarding alternative schools mandates that all students suspended or expelled from their regular schools have the *right* to attend an alternative school. *See* Tenn. Op. Atty. Gen. No. 93-43 (May 12, 1993); *see also Davidson v. Wright*, No. 03A01-9702-CH-00051, 1997 WL 304166, at *3 (Tenn. Ct. App. E.S., filed June 6, 1997) ("The provision of assignment to alternative schools for expelled students is a permissive act of the local Board of Education.") (footnote omitted).

Even if we assume, for the sake of argument, that the plaintiffs possess a property interest and entitlement to alternative education, we find that the evidence does not support their contention that the defendants arbitrarily place students in the night program. Ms. Pat Williams, the principal at Richard Yoakley School and a member of the alternative education placement committee, testified that space was the primary factor considered when placing students in alternative schools. The day program at Richard Yoakley School has room for a total of 40 alternative education students. Ms. Williams testified that, space permitting, students with zero tolerance expulsions, *i.e.*, 180 days, are placed in the day program first. The students with long-term suspensions are next placed in the day program. The students with shorter suspensions are the last to be placed in the day program, meaning that the students with shorter suspensions generally get assigned to the night program. Ms. Williams also testified that, because of the lack of space in the day program, some students with long suspensions are initially placed in the night program, but, after space becomes available in the day program, the students are transferred to Richard Yoakley School. Mr. Walter Mencer, another member of the screening committee, testified that, if a student with unique circumstances requires placement in the day program, such placement could be accommodated by transferring a student who had not completed his or her full suspension back to his or her regular school.

---

[3]Article XI, Section 12 provides as follows:

> The State of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools. The General Assembly may establish and support such postsecondary educational institutions, including public institutions of higher learning, as it determines.

The day alternative education program at Richard Yoakley School, as compared with the night program, appears to offer a more traditional format for instruction. Like most regular schools, teachers, rather than computers, provide the subject matter instruction. Furthermore, the instruction occurs during the day over a six and a half hour-time frame, rather than during the night over a three-hour time frame.

The number of places available in the day program is obviously a significant factor affecting the defendants' placement of students in that program. *Cf.* T.C.A. § 49-6-3103 (2002) (listing factors that regular public schools can consider in assigning students to particular schools).[4] Because students with longer suspensions will be away from the formal structure of their regular schools for more time, it makes sense to first place those students with the longer suspensions in the program that provides more traditional instruction and format. After all, it is the students with the longer suspensions that have the greatest risk of falling behind in their regular course work. Accordingly, we hold that the placement procedure outlined by Ms. Williams and Mr. Mencer is reasonable and not arbitrary. *See **Morrison***, 494 S.W.2d at 772; ***Marion County Bd. of Educ.***, 302 S.W.2d at 59.

Within the argument section of their brief on this issue, the plaintiffs appear to also contend that the defendants violated the requirements of due process by failing to even offer alternative education services to some students. The plaintiffs presented the testimony of several parents/guardians who claim that their students, at one point or another, were not offered alternative education services by the defendants. L.C., the mother of a suspended child, testified that, early in the 2004-2005 school year, her child attended an alternative school after being suspended for bringing a gun to school. Apparently, when the child returned to school, the child was suspended again, and according to L.C., the child was not offered alternative education services at the time of the second suspension. T.R. testified that, following her child's disciplinary hearing, "the slip" that

---

[4] T.C.A. § 49-6-3103, which deals with the assignment of students to their regular public schools, provides that the board of education may consider, and base its assignment of students on, any one of the following relevant factors:

> *(1) Available room and teaching capacity in the various schools*;
>
> \* \* \*
>
> (4) The effect of the enrollment on the welfare and best interests of such pupil and all other pupils in the school as well as the effect on the efficiency of the operation of the school;
>
> \* \* \*
>
> (22) All other factors which the board may consider pertinent, relevant or material in their effect upon the welfare and best interest of the applicant, other pupils of the school district as a whole and the inhabitants of the school district.

(Emphasis added).

-14-

she received stated that her child would be offered alternative education services. She stated, however, that she never heard from anyone regarding her child's attendance at an alternative school. After some time passed, T.R. called one of the alternative schools to inquire into why her child was not receiving alternative education. The alternative school communicated that it did not have a referral regarding her child and told T.R. that her child's paperwork must have been lost or misplaced. T.R.'s child began attending the alternative school shortly thereafter. K.M. testified that her child was suspended for a zero tolerance offense and that no one offered alternative education services to her child, who, at the time, was 18 years old (*i.e.*, outside the age of compulsory education). M.R. testified that her three grandchildren were all suspended for zero tolerance offenses. She testified that two of her grandchildren were not offered alternative education, while one grandchild was immediately offered alternative education through the night program. She further testified that, following an appeal of the suspensions, the two grandchildren that were not initially offered alternative education services attended the day program at Richard Yoakley School. The other grandchild attended one of the night alternative education schools.

The foregoing anecdotal evidence fails to establish that the defendants violated the students' due process rights by not offering alternative education services. First, as we have already stated in this opinion, the law does not require the defendants to offer alternative education services to all students who are suspended or expelled. *See* T.C.A. § 49-6-3402(a); ***Davidson***, 1997 WL 304166, at *3; Tenn. Op. Atty. Gen. No. 93-43. Furthermore, the defendants presented evidence that it is their policy to offer alternative education to all students who have been suspended or expelled unless the principal of the student's regular school determines that the student is a threat to the safety of the school community. When a student is expelled pursuant to the zero tolerance policy, the superintendent reviews the student's records to determine whether it is appropriate to offer alternative education to that student. We find this policy to be reasonable and non-arbitrary. The evidence does not preponderate against a finding that the defendants have complied with their policy.

VI.

A.

The plaintiffs next argue that the trial court erred in holding that the defendants were not required to provide alternative education students with transportation to and from alternative schools. They first argue that the plain language and intent behind T.C.A. §§ 49-6-3402(a), 49-6-2104(a), and 49-6-501(c) require the defendants to provide transportation to all students receiving alternative education services. We disagree.

The general rules relating to statutory construction are well-settled:

> This Court's role in statutory interpretation is to ascertain and to effectuate the legislature's intent. Generally, legislative intent shall be derived from the plain and ordinary meaning of the statutory language when a statute's language is unambiguous. If a statute's

-15-

language is expressed in a manner devoid of ambiguity, courts are not at liberty to depart from the statute's words. Accordingly, courts are restricted to the "natural and ordinary" meaning of a statute unless an ambiguity necessitates resorting elsewhere to ascertain legislative intent.

*Freeman v. Marco Transp. Co.*, 27 S.W.3d 909, 911 (Tenn. 2000) (citations omitted).

T.C.A. § 49-6-3402(a) requires that at least one alternative school be "established and *available* for students in grades seven through twelve (7-12) who have been suspended or expelled." (Emphasis added). This provision is unambiguous. It requires local boards of education to make at least one alternative school "available" to suspended and expelled students in grades 7-12. It does not in any way suggest that the local board of education must provide transportation to and from that alternative school. We are not willing to so broadly expand the meaning of the term "available" to include a requirement that the local board of education provide free public transportation to and from evening alternative schools. If the legislature had so intended, it could have stated this requirement in clear and unmistakable language. It did not.

T.C.A. § 49-6-2104(a) (2002) states that "[a]ll pupils within a county shall be provided equal opportunity to attend school with any other pupil transported at public expense, except as conditions of roads or remoteness may prevent." This provision requires that, if a local board of education provides free transportation to one student, it must provide transportation to all other students within that county, unless the road conditions or the remoteness of a geographic location prevents the transportation. The plaintiffs suggest that this statute stands for the proposition that, if a local board of education provides free transportation to students attending *regular* school, the board must also provide free transportation to those students attending *alternative* schools. We decline to expand the plain and ordinary meaning of this provision in such a way.

T.C.A. § 49-6-501(c) (Supp. 2006) provides that "night schools, when established, shall be a part of the public school system, and any funds that are available for the maintenance of that system shall be for the establishment and maintenance of night schools at the discretion of the board of education." This provision states that night schools are a part of the public school system. It goes on to provide that funds that are available for the public school system shall be used for the establishment and maintenance of night schools at the *discretion* of the board of education. We simply cannot in any way read this provision as requiring the board of education to provide free public transportation to evening alternative schools. The most that we can read into this provision is that *if* a school board, in its *discretion*, decides to make transportation available for its evening school program, it can use public funds to pay for this service.

B.

The plaintiffs also argue that the defendants' denial of transportation for alternative education students violates the Equal Protection Clause of the Tennessee Constitution. *See* Tenn. Const. Art. XI, § 8. The plaintiffs assert that education is a fundamental right in Tennessee, and, therefore, strict scrutiny should apply to the defendants' denial of transportation, which as argued by the plaintiffs, leads to the unavailability of education for some students.

Acknowledging the similarity between Article XI, Section 8 of the Tennessee Constitution and the Equal Protection Clause of the United States Constitution, Tennessee courts have long applied a framework similar to that applied by the United States Supreme Court in analyzing equal protection challenges brought pursuant to Article XI, Section 8. *See Motlow v. State*, 125 Tenn. 547, 145 S.W. 177, 180 (Tenn. 1912); *King-Bradwell P'ship. v. Johnson Controls, Inc.*, 865 S.W.2d 18, 21 (Tenn. Ct. App. 1993). Under this framework, one of the following standards of scrutiny will apply: (1) strict scrutiny; (2) heightened scrutiny; or (3) reduced scrutiny, *i.e.*, the rational basis test. *State v. Robinson*, 29 S.W.3d 476, 481 (Tenn. 2000).

"Strict scrutiny applies when the classification at issue: (1) operates to the peculiar disadvantage of a suspect class; or (2) interferes with the exercise of a fundamental right." *Gallaher v. Elam*, 104 S.W.3d 455, 460 (Tenn. 2003). A "suspect" class is a class of individuals that has been "'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian process.'" *Robinson*, 29 S.W.3d at 481 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S. Ct. 1278, 1294, 36 L. Ed. 2d 16 (1973)). The plaintiffs – students receiving alternative education services – fail to meet this definition, and therefore, they are not members of a "suspect" class. Furthermore, although our Supreme Court acknowledges that Article XI, Section 12 of the Tennessee Constitution guarantees the school children of this state the right to a free public education, our courts have not held, to date, that education in Tennessee is a fundamental right. *See Tennessee Small Sch. Sys.*, 851 S.W.2d at 155. Strict scrutiny, therefore, does not apply.

"Heightened scrutiny applies only to legislative classifications involving a quasi-suspect class, such as gender or illegitimacy." *Gallaher*, 104 S.W.3d at 461. The plaintiffs – students receiving alternative education – are not members of a quasi-suspect class. Absent an infringement of a fundamental right, or a classification involving a "suspect" or "quasi-suspect" class – none of which are present here – the standard to be applied in analyzing equal protection claims is the familiar "rational basis" standard. *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994); *City of Memphis v. Int'l Bhd. of Elec. Workers Union Local 1288*, 545 S.W.2d 98, 102 (Tenn. 1976); *King-Bradwell P'ship.*, 865 S.W.2d at 21. *See Tennessee Small Sch. Sys.*, 851 S.W.2d at 155 (stating that, "even without deciding whether the right to a public education is fundamental, we can find no constitutional basis for the present [funding system for public schools], as it has no rational bearing on the education needs of the districts.") (bold print in original omitted). Under the rational basis test, "a statute may discriminate in favor of a certain class . . . if the discrimination is founded

upon a reasonable distinction, or a difference in state policy." ***Castlewood, Inc. v. Anderson County***, 969 S.W.2d 908, 910 (Tenn. 1998) (quoting ***Snow v. City of Memphis***, 527 S.W.2d 55, 65, (Tenn. 1975)).

We conclude that there is a rational basis for not providing transportation to alternative education students. The legislature has determined that students who do not follow the rules at their regular schools may be suspended or expelled from those schools. *See* T.C.A. § 49-6-3401 (2002) (listing the grounds and procedures for the suspension of students). The legislature has also determined that suspended or expelled students may receive instruction at an alternative school. *See* T.C.A. § 49-6-3402. These alternative schools are *different* from regular public schools. *See, e.g.,* T.C.A. § 49-6-501(b) (stating that local boards of education may establish *night* schools for students who are suspended for misconduct). Alternative education students have broken the rules of their respective schools; therefore, they are subject to losing certain services (*e.g.*, transportation) and opportunities (*e.g.*, extracurricular activities). They are not entitled to receive the same instruction and services that are provided to students who have continued to follow the rules. We find that this distinction in treatment is reasonable.

## VII.

Lastly, the plaintiffs argue that the defendants violated their procedural due process rights by failing to implement a "formal due process policy" to follow when permanently dismissing alternative education students from alternative schools. The trial court ruled that this issue was moot in light of evidence that the defendants had implemented a policy whereby students receive notice and an opportunity to be heard before being removed from alternative schools. The plaintiffs appear to assert that the trial court erred in finding this issue to be moot because, as they argue, alternative schools should be required to adhere to the formal procedures set forth in T.C.A. § 49-6-3401(c),[5]

---

[5] T.C.A. § 49-6-3401(c) provides, in relevant part, as follows:

> (1) Except in an emergency, no principal, principal-teacher or assistant principal shall suspend any student until that student has been advised of the nature of the student's misconduct, questioned about it, and allowed to give an explanation.
>
> \* \* \*
>
> (4)(A) If, at the time of the suspension, the principal, principal-teacher or assistant principal determines that an offense has been committed which would justify a suspension for more than ten (10) days, such person may suspend a student unconditionally for a specified period of time or upon such terms and conditions as are deemed reasonable.
>
> (B) The principal, principal-teacher or assistant principal shall immediately give written or actual notice to the parent or guardian and the student of the right to appeal the decision to suspend for more than ten (10) days. All appeals must be filed, orally or in writing, within five (5) days after receipt of the notice and may be

(continued...)

*i.e.*, the procedures that regular schools must adhere to once the determination is made that a student's conduct warrants suspension from their regular school. We also find this issue adverse to the plaintiffs.

T.C.A. § 49-6-3402(c) provides that alternative education students are

> subject to all rules appertaining [to the alternative school]. A violation of such rules by a student may result in the student's removal from this school for the duration of the original suspension or expulsion, but shall not constitute grounds for any extension thereof. The final decision on such removal shall be made by the chief administrator of the alternative school.

---

[5](...continued)

filed by the parent or guardian, the student or any person holding a teaching license who is employed by the school system if requested by the student.

(C) The appeal from this decision shall be to the board of education or to a disciplinary hearing authority appointed by the board. The disciplinary hearing authority, if appointed, shall consist of at least one (1) licensed employee of the LEA, but no more than the number of members of the local board.

(D) The hearing shall be held no later than ten (10) days after the beginning of the suspension. The local board of education or the disciplinary hearing authority shall give written notice of the time and place of the hearing to the parent or guardian, the student and the school official designated above who ordered the suspension. Notice shall also be given to the LEA employee referenced in subdivision (c)(4)(B) who requests a hearing on behalf of a suspended student.

(5) After the hearing, the board of education or the disciplinary hearing authority may affirm the decision of the principal, order removal of the suspension unconditionally or upon such terms and conditions as it deems reasonable, assign the student to an alternative program, or night school, or suspend the student for a specified period of time.

(6) If the decision is determined by a disciplinary hearing authority, a written record of the proceedings, including a summary of the facts and the reasons supporting the decision, shall be made by the disciplinary hearing authority. The student, principal, principal-teacher or assistant principal may within five (5) days of the decision request review by the board of education; provided, that local school board policy may require an appeal to the director of schools prior to a request for review to the board. Absent a timely appeal, the decision shall be final. The board of education, based upon a review of the record, may grant or deny a request for a board hearing and may affirm or overturn the decision of the hearing authority with or without a hearing before the board; provided, that the board may not impose a more severe penalty than that imposed by the hearing authority without first providing an opportunity for a hearing before the board. The action of the board of education shall be final.

This provision, which authorizes the removal of students from alternative schools, does not set forth a specific process for such removal. Generally, notice and an opportunity to be heard are the minimal requirements of due process. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 656-57, 94 L. Ed. 865 (1950). *See also Phillips v. State Bd. of Regents*, 863 S.W.2d 45, 50 (Tenn. 1993). The most fundamental element of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'["] *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965)).

Again, the first question that arises in addressing this issue is whether the plaintiffs have identified a "property" interest that triggers the due process requirements. Tennessee law guarantees children of a certain age the right to a free public education. *See Tennessee Small Sch. Sys.*, 851 S.W.2d at 151. The issue before us, however, is whether the plaintiffs have a property right, or a claim of entitlement, to *alternative* education services. As previously stated in this opinion, we are aware of no authority creating such a property right in alternative education. *See* Tenn. Op. Atty. Gen. No. 93-43 (concluding that T.C.A. § 49-6-3402 does not mandate that every 7-12 grade student who is suspended or expelled be admitted to an alternative school).

Even if we were to assume, *arguendo,* that the plaintiffs possess a property interest in alternative education that triggers the due process requirements, the evidence is that the defendants have implemented a constitutionally-adequate procedure for the removal of students from alternative schools. The record contains a February, 2005, memorandum to all administrators of the night alternative education program from Mr. David Boggan, a supervisor of the night program, reminding the administrators that "any student who is dismissed from the [night alternative education program] must be given DUE PROCESS." (Capitalization in original). The memo goes on to state that this means "the student MUST be given the opportunity to explain his/her side of the story (incident), have any witnesses they select give testimony, and be told of the charges against them." (Capitalization and underlining in original). The memo further states that the student's parents must be notified that they have a right to appeal the student's removal from the alternative school. Mr. Hedgepeth testified that, prior to removing a student from an alternative school, the student and their parents/guardians are given notice, usually by way of a telephone call. He also testified that the student is given an opportunity to explain his or her side of the story. The plaintiffs failed to present any evidence to the contrary. Accordingly, we hold that the defendants' procedures regarding the removal of students from the alternative education program – procedures which provide both notice and an opportunity to be heard – do not violate the plaintiffs' due process rights.

VIII.

In summary, we hold (1) that the instruction in the Knox County Board of Education's night alternative school program is as nearly as practicable to that offered during the day in one of the Board's regular schools; (2) that the procedure by which expelled and suspended students are placed in the night school program as opposed to the alternative day school at Richard Yoakley School is not arbitrary in nature; (3) that applicable law does not require the Board to provide transportation

to and from the evening alternative schools; and (4) that students who are removed from the alternative school program for disciplinary reasons are provided appropriate notice and an opportunity to be heard with respect to the reasons for their removal. We conclude, contrary to the plaintiffs' assertions, that the evening alternative school program formulated and implemented by the Knox County Board of Education does not violate the Tennessee Code, the regulations of the Tennessee Department of Education, the Tennessee Constitution, or the Constitution of the United States.

IX.

The judgment of the trial court is affirmed. This case is remanded to the trial court for the collection of costs assessed below, pursuant to applicable law. Costs on appeal are taxed to the appellants, C.S.C., a minor, by his next friend and Mother, L.C., on behalf of C.S.C. and all others similarly situated, and M.A.M., a minor, by his next friend and Mother, B.M., on behalf of M.A.M. and all others similarly situated.

_____
CHARLES D. SUSANO, JR., JUDGE